UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

PATRICIA J. ROLAND

And all others similarly situated

         Plaintiff,

    v.

UNITY LIMITED PARTNERSHIP

         Defendant.

Case No. 07-C-1103

## DEFENDANT UNITY LIMITED PARTNERSHIP'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### <u>INTRODUCTION</u>

The Plaintiffs in this action, Patricia Roland ("Roland") and David Breecher ("Breecher"), allege violations of the Fair Labor Standards Act (the "FLSA" or the "Act") by their former employer, Defendant, Unity Limited Partnership ("Unity"). In particular, the Plaintiffs allege that Unity's on-call policy violated the FLSA because the Plaintiffs were not compensated the minimum wage for all call hours. Specifically, the Plaintiffs assert that they were not able to effectively use their on-call time for their own purposes and, thus, are entitled to compensation equal to at least the federal minimum wage. (Amended Complaint, ¶¶37, 42). In addition, Roland alleges that Unity terminated her employment in retaliation for engaging in protected activity under the FLSA. (See, 29 U.S.C. §215(a)(3); Amended Complaint, ¶¶45-46).

As the following will demonstrate, summary judgment as to all of the Plaintiffs' claims is appropriate. With regard to Unity's alleged violations of the FLSA concerning on-call time, the

undisputed facts establish that Unity imposed only the following minimal requirements on the Plaintiffs when they were on call: (1) to carry a cell phone and pager; (2) to respond to any call by calling back within 15 minutes; (3) to remain within a geographical area which was at least as large as a 35-mile radius surrounding the City of Marinette; and (4) refrain from drinking alcohol. The undisputed facts further establish that Unity placed no other restrictions on the personal activities of the Plaintiffs during on-call time and that Unity's on-call policy allowed the Plaintiffs to effectively engage in their personal activities during call. As a result, the Plaintiffs are not entitled to any additional compensation for time they spent on call at Unity.

With regard to Roland's retaliation claim, the undisputed facts show that she did not engage in protected activity under the statute. Specifically, the FLSA requires an employee to file a complaint with the Department of Labor or in court to fall within the protection of the statute. In the present case, it is undisputed that Roland did not file any such complaint prior to her termination. During her employment with Unity, Roland never complained that Unity's on-call policy violated wage and hour laws or that she was not compensated in accordance with the FLSA. Instead, Roland simply complained that call shifts occurred too frequently and/or that she was scheduled to work too many call shifts. Such complaints are not protected by the FLSA.

Finally, even if Roland's complaints were protected under the FLSA, it is undisputed that she was terminated as a result of her failure to visit a patient during the early morning hours of April 1, 2007. As such, she was not meeting Unity's job performance expectations and Unity had legitimate, non-discriminatory reasons to terminate Roland's employment. Accordingly, summary judgment must be entered.

## I.      Unity's Business

Unity Limited Partnership ("Unity") is a not-for-profit partnership between three Green Bay area hospitals: Bellin Health, St. Mary's Hospital, and St. Vincent's Hospital.  (DPFOF, ¶¶1, 3).   Unity provides hospice, palliative, and bereavement care services to individuals residing in private homes and/or residential facilities.  (DPFOF, ¶4).  Unity's service area covers twelve counties located throughout Northeast Wisconsin, including Marinette County.  (DPFOF, ¶6). Unity employs 209 employees, including nurses and nursing assistants, social workers, counselors, chaplains, and administrative staff.  (DPFOF, ¶11).

Given the nature of hospice care, regulations require Unity to have nursing staff available to provide patient care 24 hours a day, 7 days a week.  (DPFOF, ¶13).  To meet these needs, Unity's nurses are required to work some combination of both regular and call shifts.  (DPFOF, ¶14).

## II.      Unity's On-Call Policy

During the Plaintiffs' employment with Unity, its on-call policy was straight-forward and undisputed.  When an employee was on call, he/she had to (1) carry a cell phone and a pager; (2) remain within Unity's Marinette service area; (3) return any call or page within 15 minutes; and (4) refrain from drinking alcohol.  (DPFOF, ¶17).  Unity compensated its employees at a rate of $2.00 per hour for all of their on-call hours.  (DPFOF, ¶16).  In addition, if a Unity employee who was on call performed any work for Unity while on call (beyond carrying a pager/cell phone), Unity compensated the employee at a rate of one and one-half times the employee's regular rate.  (DPFOF, ¶16).  Unity's on-call policy was derived from the call policy of Bellin Health, one of Unity's general partners.  (DPFOF, ¶15).

Unity utilizes triage nurses to manage patient calls. For example, when a patient call comes in, the triage nurse gathers some basic information and then pages the on-call nurse. (DPFOF, ¶31). The on-call nurse must respond to the triage nurse's page by calling back within 15 minutes. (DPFOF, ¶17). Significantly, Unity's call policy only requires that the nurse call the triage nurse back within 15 minutes; he or she does not have to physically arrive at Unity's offices or a patient's home or facility within the 15 minute time frame. (DPFOF, ¶32). Indeed, if a call requires the nurse to make a patient visit[1], Unity imposes no time limit within which the nurse must arrive at the patient's residence or facility. (DPFOF, ¶33).

Unity's call schedule is generated by a computer program that assigns call shifts on a random basis. (DPFOF, ¶25). The call schedule is set in three or four month increments. (DPFOF, ¶26). If a nurse wants time off to attend a scheduled event, he or she can request the time off in advance. (DPFOF, ¶28). Such requests are typically granted. (DPFOF, ¶29). Furthermore, if a request is denied for any reason, Unity permits its nurses to trade call shifts. (DPFOF, ¶28). Thus, a nurse who has a conflict with a scheduled call shift can ask a co-worker to cover or trade call shifts. (DPFOF, ¶28; Roland Depo., pp. 13-25).

## III.    Unity's Timekeeping System

Unity requires its employees to keep track of their hours worked by preparing and submitting time cards. (DPFOF, ¶109). During their employment with Unity, Roland and Breecher understood that they were required to keep track of and report all of their working time on their Unity time cards. (DPFOF, ¶¶110-112). In addition, Unity kept track of all of the hours that its employees were scheduled to be on call; such on-call hours were reported on Roland and Breecher's on-call time cards. (DPFOF, ¶¶116-117). Thus, when Roland and Breecher served an

---

[1] Many calls do not require the nurse to make a patient visit. For example, many calls simply require that the nurse call the patient and/or the patient's family to respond to a question or a discuss an issue.

4

on-call shift, they would report on their time cards the number of hours they were on call, along with the amount of time they spent doing any work during the call shift. (DPFOF, ¶117). Unity required the Plaintiffs (and its other employees) to sign their time cards to verify their hours worked and then submit the time cards to their supervisor for approval. (DPFOF, ¶114).

**IV.    Employment of Plaintiff Patricia Roland**

Roland was hired as a part-time staff nurse at Unity on or about July 12, 2004. (DPFOF, ¶8). After her interview with Unity, Roland understood that, as a part time staff nurse, she would be required to work two regularly-scheduled 10 hour shifts and two 14 hour call shifts per business week (Monday through Friday). (DPFOF, ¶51). In addition, Roland was expected to be on-call two weekends per month. (DPFOF, ¶51). One of these weekends involved a 14 hour Friday night call shift and a 24 hour Sunday call shift, and the second weekend involved a 24 hour Saturday call shift. (DPFOF, ¶51).

During the course of the interview process, Roland was further informed as to the specific requirements of Unity's on-call policy, including that, while on call, Roland was required to: (1) carry a cell phone and pager; (2) respond to a page by calling back within 15 minutes; and (3) remain within the Marinette service area, which encompassed an approximately 35-mile radius surrounding Unity's office in downtown Marinette. (DPFOF, ¶52).

With respect to compensation for call shift hours, Roland learned that she would be paid $2.00/hour for simply carrying the pager and cell phone, as well as time and a half her regular rate for any work performed during a call shift. (DPFOF, ¶52(h)). Roland accepted employment at Unity with full knowledge of the compensation arrangement and on-call requirements. (DPFOF, ¶53).

Approximately one year and four months after she began employment with Unity, Roland transitioned to the position of full-time primary nurse. (DPFOF, ¶56). Primary care

nurses were responsible for managing their own caseload of approximately 15-18 patients. (DPFOF, ¶58). As a primary care nurse, Roland averaged between four and six call shifts per month and never worked more than seven. (DPFOF, ¶60).

## V. Employment of Plaintiff David Breecher

On or about August 1, 2005, David Breecher ("Breecher") began employment with Unity as a full-time staff nurse based out of Unity's Marinette office. (DPFOF, ¶87). Breecher held this position for the entire duration of his employment with Unity. (DPFOF, ¶87).

As a full-time staff nurse, Breecher was typically scheduled for regular shifts. (DPFOF, ¶89). However, pursuant to Unity policy, Breecher would not be scheduled for a regular shift if he was scheduled to be on call the previous night. (DPFOF, ¶90). In addition to his regularly-scheduled shifts, Breecher also worked approximately two call shifts per business week, and one weekend call shift per month. (DPFOF, ¶91). Breecher's time cards indicate that he worked an average of eight to nine call shifts per month. (DPFOF, ¶91).

Prior to commencing work as a staff nurse, Breecher completed a three week orientation period. (DPFOF, ¶92). The orientation involved instruction as to Unity's policies and procedures, as well as some job shadowing. (DPFOF, ¶93). During orientation, Breecher was further informed as to the requirements of Unity's on-call policy. (DPFOF, ¶94). Specifically, Breecher was instructed that, while on-call, he was required to: (1) carry a pager and cell phone; (2) respond to a page by calling back within 15 minutes; and (3) remain within the Marinette service area, which constituted an approximately 35-mile radius surrounding Unity's office in downtown Marinette. (DPFOF, ¶95). Breecher voluntarily resigned his employment with Unity in June 2007. (DPFOF, ¶88).

## VI.    **On-Call Time and Personal Activities**

As a staff nurse, Roland worked an average of approximately eight call shifts per month. (DPFOF, ¶60).  After she transferred to a primary care nurse, Roland generally worked between four and six call shifts per month.  (DPFOF, ¶60).  Breecher worked an average of between 8 and 9 call shifts per month during his employment at Unity.  (DPFOF, ¶91).  During their employment with Unity, both Roland and Breecher took advantage of Unity's policy and exchanged call shifts with their co-workers from time to time.  (DPFOF, ¶¶86, 108). Interestingly, both Roland and Breecher routinely volunteered for call shifts: Roland having volunteered for 15 call shifts and Breecher having volunteered for 36 call shifts, respectively, during their employment with Unity.  (DPFOF, ¶¶55, 107).

The Plaintiffs both acknowledged that during their employment with Unity, Unity's call policy only required them to carry a cell phone and pager, return any call within 15 minutes, remain in the Marinette service area and refrain from drinking alcohol.  (DPFOF, ¶¶63, 95). Both Breecher and Roland also acknowledged that Unity's Marinette service area compromised a geographic area which was at least as big as an area covering a 30- to 35-mile radius from the City of Marinette.  (DPFOF, ¶102).

In addition, the Plaintiffs' time cards reflect that there were call shifts when they received no calls from Unity.  Indeed, on 47% of Roland's call shifts, she received zero calls.  (DPFOF, ¶73).  Similarly, Breecher received zero calls on 38% of his call shifts.  (DPFOF, ¶104). Moreover, there were many call shifts where the Plaintiffs did not perform any work for Unity whatsoever.  (DPFOF, ¶75).  Both Roland and Breecher often elected to perform non-emergency and non-call related work during their call shifts.  (DPFOF, ¶¶68, 69, 106).

With regard to their personal activities while on call, both Breecher and Roland acknowledged that Unity's on-call policy did not specifically restrict or prohibit any personal

activities, other than the consumption of alcohol or leaving the Marinette service area.  (DPFOF, ¶¶100-102).  For example, Roland admitted that there was nothing in Unity's on-call policy that prohibited her from maintaining her house, visiting friends, visiting children or engaging in social activities.  (DPFOF, ¶¶77, 81).  Although Roland would not specifically admit that she could effectively engage in personal activities during call shifts, she nonetheless admitted to engaging in many personal activities during on-call time.  For example, Roland admitted to occasionally going to her grandchildren's soccer games, maintaining her house, making small trips to the grocery store, eating, watching TV, going outside, reading the paper, talking on the phone, paying bills and any other task which she could "walk away from."  (DPFOF, ¶¶77, 79-83).  Roland even admitted to attending an office Christmas party at one of her co-worker's homes during a call shift on December 15, 2006.  (DPFOF, ¶84).

Likewise, Breecher admitted that Unity's on-call policy did not prohibit various personal activities during call shifts.  Specifically, Breecher testified that he would engage in the following personal activities during call shifts: laying around the house, doing yard work, working in the garden, performing basic housework, watching TV, sleeping and having his children/grandchildren over to use the swimming pool.  (DPFOF, ¶98).  Breecher acknowledged that it would have been possible for him to run errands, go to his children's/grandchildren's sporting events and go on walks during call shifts for Unity.  (DPFOF, ¶99).

Significantly, other other employees who worked in Unity's Marinette service area during the same period of time as the Plaintiffs testify that they all are able to effectively use their on-call time for personal activities.  (DPFOF, ¶¶23, 24).  These employees uniformly testified that they regularly engage in the following activities while on call: sleeping, eating, watching TV and movies, shopping, cleaning their houses, engaging in yard work, exercising,

golfing, visiting family and friends, going to restaurants, going to children's and grandchildren's activities such as athletic or school-related events, attending concerts, grocery shopping, running errands, showering/bathing, going to church, going to the movies, coaching, attending family holidays, traveling to a friend's cottage, gardening, cutting wood, taking walks, taking care of pets and virtually all personal activities which they would engage in on any other day off. (DPFOF, ¶24). Indeed, one Unity employee even travelled to a friend's cottage to relax during call shifts. (DPFOF, ¶24).

## VII. Roland's Complaints About On-Call Time

Approximately six months after she began working for Unity, Roland began raising concerns regarding Unity's call schedule. (DPFOF, ¶¶120). In particular, Roland complained about two aspects of call: (1) that she was scheduled for too many call shifts and (2) that the call shifts sometimes were scheduled too closely together. (DPFOF, ¶121). Roland never complained that Unity's call policy violated the law. (DPFOF, ¶134). Additionally, Roland was asked by Unity, as part of the performance review process, to state what would cause her to leave her employment with Unity. (DPFOF, ¶122). In response, Roland wrote the following:

> "Poor schedules, I'm a person, not a number in the computer, i.e. (3 out of 4 weekends in January working!), expectation that charting will be done on days off to meet Unity's requirement. No dedicated time to do charting without pager or phone on. New pay system related to charting – time frames terrible and for Unity's benefit, not the employee or 50/50."

(DPFOF, ¶122).

When Roland expressed concerns about the amount of call she was scheduled to work, her supervisor looked into the situation and reported back to Roland that the call schedule was computer generated and that Roland was not working more call than other nurses. (DPFOF, ¶130). Roland does not recall when she last raised a concern with Unity about on-call time. (DPFOF, ¶124). In addition, Roland is not aware of a single time that a Unity supervisor reacted

9

negatively because she raised a concern about Unity's on-call policy. (DPFOF, ¶125). Roland is not aware of anyone from Unity suggesting that her job was in jeopardy because she raised concerns about Unity's on-call policy. (DPFOF, ¶131). Moreover, Roland admits that she was never disciplined for raising any concerns about being on call. (DPFOF, ¶132). Finally, other Unity employees raised concerns about the amount of call and there is no evidence to suggest that Unity took adverse action against any of those employees. (DPFOF, ¶129).

## VIII. <u>Termination of Roland's Employment</u>

Roland's job performance at Unity was not outstanding. For example, on January 26, 2007, Unity issued Roland a written "recommendation for change" because Roland was not spending a high enough percentage of her time with patients and she was not submitting her weekly schedule as required. (DPFOF, ¶¶137, 138). In January 2007, Roland had a conflict with a co-worker which resulted in a meeting between Ms. Roland and her supervisors. (DPFOF, ¶141). Additionally, in November 2006, Roland was counseled for not following through on a patient request. (DPFOF, ¶140). In March 2007, Roland's supervisor prepared a note regarding Roland's failure to make a patient assessment. (DPFOF, ¶142).

However, it was not the above performance problems which resulted in Roland's discharge. Instead, Unity elected to terminate Roland's employment because she failed to make a patient visit on the early morning hours of April 1, 2007. (DPFOF, ¶143). Specifically, during the weekend of March 31 and April 1, 2007, Roland was on call. (DPFOF, ¶144). One of her patients (FK) had terminal cancer. (DPFOF, ¶145). Roland visited the patient and his family on March 31 at 10:00 a.m. and noted that the daughter was worried about FK getting up so many times at night and that FK's wife was "scared." (DPFOF, ¶149, 150). During this visit, Roland also noted that FK's wife appeared tired and worried. (DPFOF, ¶149).

At approximately 3:25 a.m. on April 1, 2007, Roland was called by Unity's triage nurse, which required Roland to call FK's wife. (DPFOF, ¶152). During this discussion, Roland was told that FK had been "up for three hours and [was] very restless." (DPFOF, ¶152). Roland was also told that FK was undressing and had tremors. (DPFOF, ¶152). Roland suggested that FK be given some more medication, but FK's wife was hesitant to use medications because of how he might react to it. (DPFOF, ¶153). FK's wife again expressed that she was scared. (DPFOF, ¶153).

Despite the fact that FK's wife was scared, Roland elected not to make a visit. (DPFOF, ¶154). After the call, Roland left a voicemail message on Unity's system indicating that FK's wife was "at wit's end." (DPFOF, ¶¶155, 156). The next Visit Coordinator who came on duty on the morning of April 1, 2007, Diana Royer, listened to the voicemail message left by Roland. (DPFOF, ¶157). Royer determined that, under the circumstances, Roland should have made a visit to FK. (DPFOF, ¶158). Royer prepared an e-mail to her supervisor, Maribeth Braspennickx, advising Braspennickx of the situation and indicating Royer's belief that Roland should have made a visit. (DPFOF, ¶159).

Braspennickx, Unity's Director of Patient Services and Roland's supervisor, then investigated the situation. (DPFOF, ¶160). Braspennickx reviewed Roland's patient care notes in which Roland accurately documented her interactions with FK and his family members on March 31, 2007 through April 1, 2007. (DPFOF, ¶¶147, 148, 160). Based on all the circumstances, Braspennickx also concluded that Roland should have made a visit to FK on the morning of April 1, 2007. (DPFOF, ¶162). Braspennickx concluded that a visit was required because the patient was restless, had been up for several hours and because the family members were scared and in need of support. (DPFOF, ¶¶161).

Braspennickx then reported the situation to Unity's Human Resource Director and Executive Director, and the three of them reviewed the situation. (DPFOF, ¶¶163, 164). As a result of this meeting, Unity determined that Roland's employment would be terminated, effective April 4, 2007, due to her failure to make a patient visit on the morning of April 1, 2007. (DPFOF, ¶¶164-167). The fact that Roland had raised concerns about Unity's call schedule in the past was not discussed, considered or in any way a factor in Unity's decision to terminate Roland's employment. (DPFOF, ¶168).

Given the above-described undisputed facts, it is clear that summary judgment is appropriate. Unity's flexible on-call policy allowed the Plaintiffs to effectively engage in personal activities. Likewise, Roland did not engage in protected activity under the FLSA and, even if she had done so, Unity based its decision to terminate her employment on legitimate, non-discriminatory reasons.

**SUMMARY JUDGMENT STANDARD**

The Federal Rules of Civil Procedure provide that summary judgment is proper when the documentary evidence filed with the motion shows that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56. A principal purpose of the "summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. An issue is "genuine" only if there is a sufficient evidentiary basis upon which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1996). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id*. at 248; *Celotex*, 477 U.S. at 323.

Once the moving party has properly supported its motion for summary judgment, the non-moving party may not rest upon mere allegations or denials contained in the non-moving party's pleadings, but must set forth specific facts showing a genuine issue for trial, utilizing proper evidentiary material. Fed. R. Civ. P. 56(e).

To avoid summary judgment, the non-moving party "must do more than simply 'show that there is some metaphysical doubt as to the material facts.'" *Mills v. First Fed. Sav. & L. Assn. of Belvidere*, 83 F.3d 833, 840 (7th Cir. 1996) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). With respect to employment claims, the Seventh Circuit has commented "that summary judgment 'can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact.'" *Mills*, 83 F.3d at 846 (quoting *United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co.*, 794 F.Supp. 328, 330 (E.D. Mo. 1992) *aff'd*, 991, F.2d 801 (8th Cir. 1993)). Federal Courts have applied this summary judgment standard to claims brought under the FLSA. *Herman v. Anderson Floor Co., Inc.*, 11 F.Supp. 2d 1038, 1041 (E.D. Wis., 1998). As the following will demonstrate, summary judgment on all of the Plaintiffs' claims is appropriate.

## ARGUMENT

## I.     UNITY'S ON-CALL POLICY IS NOT SO RESTRICTIVE SUCH THAT CALL SCHEDULED HOURS CONSTITUTE COMPENSABLE HOURS WORKED UNDER THE FAIR LABOR STANDARDS ACT.

The FLSA requires that all covered employees be paid a minimum wage for all hours worked as well as overtime for hours worked over 40 in a week. (29 U.S.C. §§206-207). Thus, determining what constitutes "hours worked" is necessary step in evaluating an employer's compliance with the FLSA's minimum wage and overtime requirements.

In their Complaint, the Plaintiffs allege that Unity is obligated to compensate them for on-call time involving no work other than carrying the pager and cell phone. (Amended Complaint, ¶¶ 35-42). In other words, the Plaintiffs contend that Unity violated the FLSA by failing to pay them the federal minimum wage and any applicable overtime rates for *all* on-call hours. (*Id*. at ¶¶ 40-41). However, as the following will demonstrate, the limited requirements of Unity's on-call policy permitted its nurses, including the Plaintiffs, to effectively use call time for their own purposes. *See*, 29 C.F.R. § 785.17. As a result, the FLSA does not entitle the Plaintiffs to compensation for hours spent on-call, but not working.

### A. <u>"Hours Worked" Are Those Spent Predominately for the Benefit of the Employer.</u>

The FLSA does not define when an individual is considered to be working for purposes of the Act. The Supreme Court has provided a general framework, holding that an employee's time is "work" for purposes of the FLSA if it is spent predominately for the benefit of the employer. *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944). With regard to the on-call time, the U.S. Department of Labor ("DOL") regulations provide as follows:

> "An employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while 'on-call'. <u>An employee who is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached is not working while on call</u>." 29 C.F.R. § 785.17 (citing *Armour*, 323 U.S. 133; *Handler v. Thrasher*, 191 F.2d 120 (C.A. 10, 1951); *Walling v. Bank of Waynesboro, Georgia*, 61 F.Supp. 384 (S.D. Ga. 1945). (emphasis added).

As the following will demonstrate, the undisputed facts show that the Plaintiffs are not entitled to any additional compensation for their on-call time.

### B. <u>The Plaintiffs' Claims Fail Because They Were Able To Use Call Time for Own Purposes.</u>

Courts have considered a variety of factors in determining whether call time is "predominately for the benefit of the employer." Notably, however, both the DOL regulations

14

and the Seventh Circuit focus primarily on what an employee *is* able to do while on-call. Indeed, in *Dinges v. Sacred Heart St. Mary's Hospitals, Inc.*, the Seventh Circuit framed the underlying inquiry as whether on-call time can be devoted to "ordinary activities of private life." 164 F.3d 1056, 1057 (7th Cir. 1999). "If so, it is not 'work'" within the meaning of the FLSA. *Id.*

Given the factual similarities with the present case, a further examination of the Seventh Circuit's holding in *Dinges* is instructive. The plaintiffs in *Dinges* were two emergency medical technicians ("EMTs") employed the defendant, which operated a hospital in Tomahawk, Wisconsin. *Id.* EMTs employed by the hospital were required to work a combination of both regular and call shifts. *Id.* While on-call, the plaintiffs were required to arrive at the hospital within 7 minutes of receiving a page. *Id.*

The plaintiffs brought suit against the hospital under the FLSA, alleging that the hospital's call policy interfered with their ability to engage in personal activities. *Id.* at 1057. Specifically, the plaintiffs alleged that they could not travel outside Tomahawk, or otherwise attend events out of town. *Id.* They allegedly could not engage in activities where loud noise would interfere with their ability to hear a page, such as mowing the lawn, snowmobiling, or attending concerts. *Id.* The call policy also allegedly interfered with their ability to shop and engage in recreational activities, such as hunting, fishing, boating, and camping. *Id.* The plaintiffs were prohibited from drinking any alcohol. *Id.* Finally, one of the plaintiffs could not attend her children's school events, and had to have a babysitter on hand during all call hours because she could be called away at any time. *Id.*

Despite the fact that the hospital's call policy allegedly interfered with the plaintiff's ability to engage in certain activities, the court concluded that this was not the proper focus. Rather, the court held that the relevant inquiry is "whether the employee can 'use the time

Case 1:07-cv-01103-WCG   Filed 05/15/09   Page 15 of 41   Document 29

effectively for personal pursuits' – not for *all* personal pursuits…" *Id*. at 1058. In short, the court should consider what the employees can do while on-call, not simply what they are restricted from doing.[2]

Applying this standard, the *Dinges* court emphasized the activities that the plaintiffs *could* effectively engage in while on-call, such as cooking, eating, sleeping, reading, exercising, watching TV and movies, doing housework, caring for pets, family, and loved ones at home, watching children participate in sporting events, and going to restaurants. *Id*. In light of the numerous activities that the plaintiffs could engage in while on-call, the court concluded that the time spent on call could effectively be used for personal pursuits, and was thus non-compensable. *Id*. at 1059.

Applying the Seventh Circuit's holding in *Dinges*, it is clear that the Plaintiffs were able to use call time for their own purposes. The only requirements imposed by Unity's on-call policy were that Plaintiffs had to: (1) carry a cell phone and pager; (2) respond to a page by calling back within 15 minutes; (3) stay within a 35 mile radius surrounding Unity's office in downtown Marinette; and (4) refrain from drinking alcohol. (DPFOF, ¶¶17, 52, 95). Despite these limited requirements, Plaintiffs allege that they could not engage in a variety of activities while on-call.

---

[2] Other circuits have echoed the Seventh Circuit's holding in this regard. For example, the Ninth Circuit has held that "the inquiry…is not whether the [plaintiffs] are prevented from participating in certain personal activities, but whether they actually engage in personal activities during on-call shifts. An employee need not have 'the same flexibility or freedom as he would if not on call' to engage in personal activities in order to conclude that he can use on-call time effectively for his own purposes." *Berry v. County of Sonoma*, 30 F.3d 1174, 1185 (9th Cir. 1994) (citing *Owens v. Local No. 169*, 971 F.2d 347, 350-51 (9th Cir. 1992) (internal citations omitted)). Similarly, the Fifth Circuit concluded that the FLSA does not require that the employee "have substantially the same flexibility or freedom as he would if not on call, else all or almost on-call time would be working time, a proposition that the settled case law and the administrative guidelines clearly reject." *Bright v. Houston Northwest Med. Ctr. Survivor, Inc.*, 934 F.2d 671, 677 (5th Cir. 1991).

Case 1:07-cv-01103-WCG   Filed 05/15/09   Page 16 of 41   Document 29

For example, Roland alleges that while on call for Unity, she refrained from vacuuming, cutting the grass, going out to dinner with friends, working the concession stand at her granddaughter's soccer games, drinking alcohol, and attending family events out of town. (Roland Depo., pp. 93:9-14; 94:3-7; 102:19-23; 105:6-12; 109:18-25; 110:1-4; 118:8-25; 119:1-12). Roland further testified that although she would go to the grocery store to pick up a few items while on-call, she would not do larger "weekly grocery shopping" out of concern that she might have to cut the trip short. (Roland Depo., pp. 108:10-22; 109:2-9). Similarly, Roland contends that she would not run errands "most of the time" because she did not want to be interrupted. (Roland Depo., p. 133:2-11).

With respect to Breecher, he alleges that while on call, he chose to refrain from going out to dinner, using a lawn mower or leaf blower, vacuuming, using power equipment, drinking alcohol, running errands, taking walks, and attending his grandchildren's athletic events. (Breecher Depo., pp. 81:13; 82:24-25; 84:18-19, 22-23; 87:2-3; 87:9-16; 89:14-23). Breecher further indicated that he did not visit with family and friends while on call.[3] Significantly, however, Breecher admitted that he would not typically engage in such activities even on his days off, as most of the people he associates with would "undoubtedly" be at work. (Breecher Depo., pp. 77:16-20; 81:15-19).

The activities that the Plaintiffs allege they were unable to engage in are strikingly similar to those alleged by the plaintiffs in *Dinges* (*see* pgs. 15-16, *supra*). The court in *Dinges* however, focused not on what the plaintiffs chose not to do, but rather on what the on-call policy allowed them to do. *Dinges*, 164 F.3d at 1058. As outlined above, employees are not required to

---

[3] Breecher also complains that Unity's on-call policy required Breecher to schedule activities with his friends and family around his call schedule. (Breecher Depo., pp. 81:19-25; 82:1-5). Breecher's argument in this regard is entirely irrelevant, as most, if not all, working individuals have to schedule their personal activities around their work schedule.

have the same degree of freedom or flexibility while on-call in order for such time to be considered available for their own personal pursuits. *Owens*, 971 F.2d at 350-51. Thus, even assuming that the Plaintiffs in the present case chose not to perform the activities alleged, their call time was nonetheless non-compensable, because Unity's on-call policy permitted them to use the time to engage in a variety of personal pursuits.

For example, it is undisputed that Unity did not restrict any personal activities while on call, other than drinking alcohol. (DPFOF, ¶100). Indeed, Roland admits that she performed the following personal activities while on call: visiting with friends, visiting with her children, cleaning out the garage, preparing "simple" meals, watching TV, reading the paper, paying the bills, walking around the yard, talking on the phone, performing household chores other than vacuuming, sweeping the floor and sleeping. (DPFOF¶¶77, 81-83). In addition, Roland acknowledges that she occasionally attended her granddaughter's soccer games while on-call. (DPFOF, ¶79). Roland also testified that Unity's call policy did not prevent her from attending certain social events such as the office Christmas party. (DPFOF, ¶84).

Turning to Breecher, he acknowledged that while on call, he would lay around the house, do yard work, work in the garden, perform basic housework, watch TV, sleep, and have his children and grandchildren over to use his pool (DPFOF, ¶98).

Significantly, courts have previously ruled that a plaintiff's admission that he still engages in numerous personal activities while on call precludes a finding that the plaintiff is unable to use the call time for his own pursuits. *Martin v. Ohio Turnpike Com'n*, 968 F.2d 606, 612 (6th Cir., 1992).

The conclusion that Unity's on-call policy permits its nurses to use call time effectively for their own purposes is further confirmed by the testimony of other nurses who worked in

Unity's Marinette service area. These nurses verify that, while on-call, they were able to sleep, eat, watch TV and movies, shop, clean their houses, engage in yard work, exercise, golf, visit family and friends, go to restaurants, go to their children's and grandchildren's activities such as athletic or school-related events, attend concerts, grocery shop, run errands, shower/bathe, go to church, go to the movies, coach, attend family holidays, travel to their friend's cottage, garden, cut wood, take walks and take care of pets. (DPFOF, ¶24).

The testimony of the Plaintiffs and the other nurses make clear that Unity's on-call policy permitted them to engage in a "virtually unlimited range of activities" at home or within the service area. *Reimer v. Champion Healthcare Corp*., 258 F.3d 720, 725 (8th Cir. 2001) (nurses not entitled to compensation under the FLSA for time spent on-call where they had to be reachable by cell phone or beeper and arrive at hospital within 20 minutes of receiving a call). In contrast, employees who have received compensation for idle call time "generally have had almost no freedom at all." *Halferty v. Pulse Drug Co. Inc*., 864 F.2d 1185, 1190 (5th Cir. 1989) (citing *Cole v. Farm Fresh Poultry, Inc.*, 824 F.2d 923, 927 (11th Cir. 1987)) (time spent waiting during eviscerating line shut downs of one hour or less are compensable because plaintiffs could not effectively use breaks of less than one hour for their personal use). Thus, while the Plaintiffs were undoubtedly inconvenienced by Unity's on-call policy, their personal activities were not so restricted such as to eliminate all freedom and entitle them to compensation under the FLSA.

Finally, it is important to note that some of the Plaintiffs' allegations regarding activities they supposedly could not engage in because of Unity's on-call policy border on the preposterous. For example, Roland alleges that she was not able to take a shower or bath while on-call. (Roland Depo., pp. 126:24-25; 127:1-6). Breecher contends that he could not leave the house or yard. (Breecher Depo., p. 81:14-15). It is difficult, if not incredible, to believe that the

Plaintiffs never showered or left the house while on-call during the entire course of their employment with Unity. Such claims are completely at odds with Unity's on-call policy and the experience of other similarly situated Unity employees. (DPFOF, ¶24).

That Unity's on-call policy did not prohibit the Plaintiffs from engaging in these and other activities is supported by the testimony of other Unity employees. As noted above, other nurses have testified as to the wide variety of activities that they frequently engaged in during call shifts. (DPFOF, ¶24). In fact, the Plaintiffs themselves acknowledged that they were never instructed to refrain from engaging in certain activities while on-call. (DPFOF, ¶100).

Thus, even if the Plaintiffs did restrict themselves to the extent alleged while on call, it is undisputed that they did so on their own accord rather than at Unity's direction. Breecher himself acknowledged that it would have been possible to run errands, go to basketball games and go on walks under Unity's on-call policy. (DPFOF, ¶99). Nevertheless, the Plaintiffs elected not to engage in certain personal activities (despite the fact that many other Unity nurses did) because they wanted to be available to immediately answer a call or make a visit. (Roland Depo., pp. 103:18-25; 104:1-2; Breecher Depo., p. 90:4-14). However, the Plaintiff's apparent devotion to their jobs, no matter how admirable, does not change the fact that Unity did not impose such requirements on them. An employee cannot unilaterally change an employer's requirements in order to fall under the protection of the Act. Accordingly, to the extent that the Plaintiffs voluntarily restricted their activities, such conduct is not relevant to the determination of whether they are entitled to compensation under the FLSA.

In sum, because the Plaintiffs were free to use call time effectively for their own purposes, their on-call hours do not constitute compensable "hours worked" under the FLSA.

### C. The Plaintiffs Are Not Entitled to Compensation For Call Hours Because Unity Did Not Impose Any Significant Limit on Where They Could Go During Call Hours.

In addition to the employee's ability to use call time for personal activities, courts also consider any physical restrictions imposed by the employer in determining whether on-call time is compensable under the FLSA. As a general matter, courts are more likely to conclude that on-call time is compensable when the employer requires that the employees remain at a fixed location (such as the employer's premises or at home) while on-call.[4] *See, e.g., Armour & Co. v. Wantock*, 323 U.S. 818 (1944) (holding that time was compensable where employer required private firefighters to remain in a fire hall adjacent to soap factory after punching out).

In contrast, however, courts have consistently denied compensation to employees who were free to spend their call time away from home and/or engaged in a variety of personal pursuits. For example, in *Gilligan v. City of Emporia, Kan.*, 986 F.2d 410, 411 (10th Cir. 1993), the court denied compensation where the employer's on-call policy only required that the employees remain within Emporia city limits while on-call. Similarly, in *Bright*, the court held that the plaintiff was not entitled to compensation where he was not required to remain at his employer's place of business, but rather was free to be at home or at any place he chose so long as he could arrive at the hospital within approximately twenty minutes. 934 F.2d at 676.

Such decisions are supported by the DOL regulations, which provide that "an employee who is not required to remain on the employer's premises, but is merely required to leave word at home or with company officials where he or she may be reached is not working while on call." 29 C.F.R. § 785.17

---

[4] But note, however, that some more recent decisions have refused to award compensation for on-call hours even where the employer restricted the employees to a certain fixed location. For example, in *Rosseau v. Teldyne Movible Offshore Inc.*, 805 F.2d 1245 (5th Cir. 1986), the court held that employees of a barge operator who were required to remain on the barge even while off-duty were not entitled to compensation under the FLSA. *See also, Allen v. Atlantic Richfield Co.*, 724 F.2d 1131 (5th Cir. 1984) (denying compensation for on-call time to security guards who were not permitted to leave grounds of the employer's oil refinery while on-call).

Case 1:07-cv-01103-WCG    Filed 05/15/09    Page 21 of 41    Document 29

In the present case, Unity did not require that the Plaintiffs remain on its premises or any other designated location during call hours. (DPFOF, ¶¶22, 101). Indeed, the Plaintiffs acknowledged that under Unity's on-call policy, they were free to go anywhere so long as they carried their cell phone and pager and stayed within a 35 mile radius of Unity's office in downtown Marinette. (DPFOF, ¶102). Such requirements are similar, or even less restrictive, than other physical restrictions the courts have previously found insufficient to trigger the FLSA's compensation provisions. *See, Gilligan*, 986 F.2d at 411; *Bright*, 934 F.2d at 676 (discussed *supra*). Accordingly, the physical restrictions imposed under Unity's on-call policy do not entitle the Plaintiffs to compensation under the Act.

**D.** **The Plaintiffs' Claims Fail Because of the Reasonable Response Time Allowed By Unity.**

Another factor courts consider in determining whether on-call time is compensable is the length of the required response time. If the fixed time period for reporting back to work is "unduly restrictive", the court may hold that the employee is unable to effectively use the call time for his or her own purposes. *Owens*, 971 F.2d at 351 (9th Cir. 1992).

The Seventh Circuit has not articulated precisely what constitutes an unduly restrictive response time. Notably, however, courts addressing the issue have consistently held that on-call policies that require employees to report back to work within 15-20 minutes of receiving a call or page are not so restrictive as to require compensation under the Act. *See, e.g.*, *Dinges*, 164 F.3d at 1058 (call hours not compensable even though employees required to return to hospital within 7 minutes of receiving page); *Reimer*, 258 F.3d 720 (call time not compensable where employees required to report to hospital within 20 minutes of receiving page); *Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802 (11th Cir. 1992) (court refused to award compensation for call-hours where on-call policy required that employees "immediately" report to work in uniform after receiving

page); *Norton v. Worthen Van Serv. Inc.*, 839 F.2d 653 (10th Cir. 1988) (court denied compensation under the FLSA to van drivers who were required to respond within 15-20 minutes of call).

In the present case, the only response requirement imposed by Unity was that the Plaintiffs were required to respond to a page by calling back within 15 minutes.[5]  (DPFOF, ¶32). Significantly, the Plaintiffs were not required to physically arrive at any specified location (e.g., Unity's offices or the patient's residence) within the 15 minute time frame.  (DPFOF, ¶32).  In fact, when a call required a nurse to make a visit, Unity did not impose any time limit within which they must arrive at the patient's house or facility.  (DPFOF, ¶33).  Thus, in light of the fact that courts have denied compensation under policies requiring that employees physically return to work within 15-20 minutes, Unity's less restrictive policy requiring that Plaintiffs simply call back within 15 minutes is not unduly restrictive.

The Ninth Circuit reached the same conclusion in *Berry v. County of Sonoma*, 30 F.3d 1174 (9th Cir. 1994).  The plaintiffs in *Berry* were county coroners who were required to call back within 15 minutes of receiving a call or page regarding a death report.  *Id.* at 1178.  When calling back, the coroners determine whether it is a coroner's case, and, if so, either conduct an investigation by telephone or visit the scene of death.  *Id.*  Like in the present case, there was no

---

[5] Roland's testimony on the issue of the required response time under Unity's on-call policy is contradictory and entirely unsupported by the evidence.  At one point in her deposition, Roland testified that sometimes, when the triage nurses were busy, they would call her cell phone directly rather than page her.  (Roland Depo., p. 65:1-3). Roland further testified that in such instances the triage nurses expected her to answer the phone immediately. (Roland Depo., pp. 94:23-25; 95:1-11).  As an initial matter, such allegations are entirely at odds with Roland's own deposition testimony.  At numerous points in her deposition, Roland acknowledged that no matter whether she was paged or called on her cell phone, she had 15 minutes to call back.  (Roland Depo., pp. 46:19-25; 47:1-5; 65:4-12; 87:6-11).  Furthermore, no other Unity nurses, including Roland's own co-plaintiff, have testified that they were expected to immediately answer their cell phones while on-call.  (Wagner Aff., ¶6; Trossen Aff., ¶11, D. Pichette Aff., ¶4; Frea Aff., ¶4; Arnold Aff., ¶4).  Thus, the evidence clearly demonstrates that Unity's on-call policy only required that its nurses call back within 15 minutes of receiving a page.  Roland's allegations to the contrary are entirely incorrect.

explicit response time required for a coroner to initiate an investigation or report to the scene of death. *Id*. at 1184.

In denying the plaintiffs' claims for compensation, the *Berry* court cited to a number of cases holding that on-call time was not compensable where the employees were required to *arrive* at the employer's premises within approximately 20 minutes of receiving a page. *Id*. at 1184. The court then distinguished the case before it, noting that "the only required response time is fifteen minutes to answer a page or telephone call, not in person or at the employer's premises, but by telephone or two-way radio." *Id*. Holding that such required response "is substantially different than being required to return to the employer's premises within twenty minutes," the court concluded that the plaintiffs were not prohibited in their personal pursuits. *Id*. Similarly, because Roland and Breecher were only required to call back within 15 minutes, Unity's on-call policy is not "unduly restrictive" and the Plaintiffs' claims for compensation must fail.

### E. The Frequency of Calls Was Not So Burdensome to Make The Plaintiffs' Call Hours Compensable.

Courts also consider the frequency of calls received in determining whether on-call waiting time is compensable under the FLSA. If the number of calls received during a call shift is so burdensome that the employee cannot effectively use such call time for his or her own purposes, the employee may be entitled to compensation under the Act. *See, e.g., Martin*, 968 F.2d at 611-12. In contrast, if the calls were not so frequent such as to seriously interfere with the employee's personal activities, the call time is not compensable. *See, e.g., Dinges,* 164 F.3d 1056.

For example, in *Dinges*, the plaintiff EMTs were required to return to the hospital within 7 minutes of receiving a page. *Id*. at 1057. Over the 338 call shifts plaintiff Dinges worked, he

had 184 pass without receiving a call or page. *Id*. at 1058. Thus, Dinges received at least one call on 46% of his call shifts. *Id*. The Seventh Circuit held that the frequency of calls was not so burdensome such as to interfere with the plaintiffs' ability to effectively use call time for personal pursuits. *Id*. Similarly, in *Reimer*, the Eight Circuit held that the frequency of calls was not unduly restrictive where plaintiffs received approximately one call per shift. 258 F.3d at 724. *See also, Bright*, 934 F.2d at 674 (frequency of calls not unduly restrictive where plaintiff was called "on average" 2 times during work weeks and an additional 2-3 times on the weekends).

The Plaintiffs in the present case allege that the frequency of calls received during their call shifts interfered with their ability to engage in personal activities. (Breecher Depo., p. 89: 12-13; 92: 15-17). However, the Plaintiffs have no independent information regarding the frequency of calls they received during call shifts, and acknowledge that the only place to find such information is their timecards. (DPFOF, ¶70).

Significantly, the Plaintiffs' timecards demonstrate that the frequency of calls received was not unduly restrictive or burdensome. For example, Roland worked 184 call shifts during her employment with Unity and received 181 calls over the course of these shifts. (DPFOF, ¶71). Thus, Roland received an average of .98 calls per call shift. (DPFOF, ¶72). Additionally, on 87 of these call shifts (47%), Roland received zero calls. (DPFOF, ¶73).

With respect to Breecher, he worked 192 call shifts during his employment with Unity. (DPFOF, ¶103). Over the course of these 192 shifts, Breecher received 188 calls, which results in an average of only .98 calls per call shift. (DPFOF, ¶103). On 74 of his call shifts (38%), Breecher received zero calls. (DPFOF, ¶104).

As noted above, courts have previously held that receiving approximately 1 call per shift does not interfere with an employee's use of call time such as to require compensation under the FLSA. *Reimer*, 258 F.3d at 724. Furthermore, it is important to note that in *Reimer* and the other cases outlined in this section, the plaintiffs had to physically arrive at a designated location within the required response time in response to every call.

In contrast, many of the calls that the Plaintiffs received did not require them to travel to make a patient visit. Out of the 184 call shifts Roland worked during her employment at Unity, she received at least one call on 97 of those shifts. (DPFOF, ¶74). Of the 97 shifts where she received at least one call, Roland was not required to make a patient visit on 32 of those shifts (33%). (DPFOF, ¶74). Breecher also acknowledged that calls did not always require that he travel to make a patient visit. (DPFOF, ¶105). Indeed, there were instances where a call only required that he make a telephone call to the patient or patient's family. (DPFOF, ¶105).

Clearly, a policy requiring that employees physically arrive at a designated location in response to every call interferes with their ability to engage in personal activities to a greater extent than a policy that often requires nothing more than a telephone call. Thus, because the Plaintiffs received an average of less than one call per shift, and were not always required to respond to a call in person, the Plaintiffs were free to engage in personal activities and are not entitled to compensation under the Act.

Finally, the Plaintiffs may argue that the number of hours worked during their call shifts demonstrates that Unity's call policy interfered with their ability to effectively use call time for their own purposes. As an initial matter, courts determining the compensability of call time have considered the frequency of calls (i.e., how often the plaintiffs are interrupted), not the quantity of hours worked. *See, e.g., Dinges*, 164 F.3d at 1058. Furthermore, while Roland and Breecher

worked an average of 3.5 and 3.3 hours per call shift respectively, they both acknowledged that some of this work was not in response to calls received during the call shift. (DPFOF; ¶¶68, 69, 106; Breecher Depo., pp. 75:10-13, 24-25; 76:1-2). In such cases, the Plaintiffs either scheduled a visit or voluntarily elected to perform work such as charting during their call shifts. (DPFOF, ¶¶68, 106). Given that the Plaintiffs earned time and one half their regular rate of pay for any work performed during a call shift, there was certainly a financial incentive for Plaintiffs to perform work and accumulate hours during their call shifts. As such, the number of hours worked during Plaintiffs' call shifts should not be considered in determining whether Plaintiffs are entitled to compensation under the Act.

**F.** **The Number of Scheduled Call Shifts Does Not Entitle The Plaintiffs To Additional Compensation.**

Both Plaintiffs complain about the number of call shifts and total call hours they were scheduled for while employed at Unity. (Roland Depo., pp. 135:22-25; 136:1-2; Breecher Depo., p. 104:4-5). Such complaints, however, are entirely irrelevant. First, Breecher's alleged dissatisfaction regarding the number of call hours he was scheduled for is contradicted by the fact that he frequently volunteered to pick up additional shifts. Breecher's performance evaluation dated February 28th, 2006 provides that Breecher "consistently helps out in areas of need, i.e. picks up extra shifts…" Indeed, of the 192 call shifts Breecher was scheduled for during the course of his employment, 36 of those shifts were shifts that he voluntarily picked up. (DPFOF, ¶¶103, 107). Breecher volunteered to take these additional shifts despite the fact that he knew he was not required to and was not aware of anyone being disciplined for refusing to pick up extra shifts. (Breecher Depo., pp. 97:13-25; 98:7-25; 99:1-8). Breecher further undermined his complaint by later testifying that he didn't feel that there was too much call at Unity, but rather felt it should be more evenly distributed. (Breecher Depo., p. 103:18-25).

27

Second, the number of scheduled call hours is irrelevant to the determination of whether the Plaintiffs are entitled to compensation under the FLSA. The FLSA does not impose a limit on the number of hours that an employee can lawfully work. Rather, the FLSA requires that employers pay a premium rate for any hours worked in excess of 40 per week. 29 U.S.C. §207. In fact, courts have held that policies requiring that employees be subject to call on *all* off-duty hours (essentially at work or on-call 24 hours a day, 365 days a year) do not run afoul of the FLSA's overtime provisions. *See, Bright*, 934 F.2d at 678-79. As a result, the Plaintiffs' arguments regarding the number of scheduled call hours are misplaced.

Finally, even assuming that the Plaintiffs were dissatisfied with the number of scheduled call shifts, they could have requested off or traded call shifts with a co-worker. Unity has a flexible swap policy that permits employees to trade call shifts so long as the trade is approved by a supervisor. (DPFOF, ¶¶28, 29). The Seventh Circuit has considered an employer's flexible swap policy an important factor weighing against the compensability of call hours under the FLSA. *See, Dinges*, 164 F.3d at 1058.

Nevertheless, Breecher alleges that he did not trade call shifts often because he did not want to create conflict or infringe on his co-workers' off duty time. (Breecher Depo., p. 94: 1-16). While conscientious, Breecher's actions in this regard are immaterial. The proper inquiry is whether the employee *can* easily trade on-call responsibilities. *Owens*, 971 F.2d at 351 (emphasis added). Both Plaintiffs testified that they had, on occasion, taken advantage of Unity's policy and traded call shifts with a co-worker. (DPFOF, ¶¶86, 108). Thus, there is no evidence to suggest that the Plaintiffs were prohibited from or had difficulty switching shifts. The fact that they were seldom willing to do so is beside the point. *Berry*, 30 F.3d at 1185.

### G.    The Plaintiffs Are Not Entitled to Additional Compensation Because They Accepted Employment at Unity With Full Knowledge of Its On-Call Policy.

Finally, another important factor that the courts consider in determining the compensability of on-call time is the existing agreement between the parties.  Although an employer cannot contract out of the legal requirements imposed under the FLSA, courts have considered the existing agreement between the parties as evidence of who is the intended primary beneficiary of the on-call time.  *See, Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944).  Indeed, the Seventh Circuit has held that, to the extent that there is uncertainty regarding the compensability of on-call time, courts "must take account of the arrangements plaintiffs themselves choose."  *Dinges*, 164 F.3d at 1059.  The court further noted that "although the FLSA overrides contracts, in close cases it makes sense to let private arrangements endure-for the less flexile statutory approach has the potential to make everyone worse off."  *Id.*

Although the Plaintiffs did not have written employment agreements, they accepted employment with Unity with full knowledge that they would be expected to work a combination of regular and call shifts.  (DPFOF, ¶¶51-53, 96).  Additionally, they were fully aware of the specific requirements of Unity's on-call policy.  (DPFOF, ¶¶51-53, 97).  Despite their alleged dissatisfaction with Unity's policy, both Plaintiffs continued to remain employed there for a number of years.  (DPFOF, ¶¶46, 51-53, 87-88, 135;  Breecher Depo., p. 43:7-10).  Even if the employer's policy is disfavored, an agreement may be held to exist if the employee knew about the policy and continued to work under its terms.  *Owens*, 971 F.2d at 354-55.

Accordingly, because all of the factors outlined above weigh against the compensability of call time, and because the Plaintiffs agreed to employment with full knowledge of the terms of Unity's policy, the Plaintiffs are not entitled to additional compensation under the FLSA.  As such, the Court must enter summary judgment dismissing the Plaintiffs' FLSA wage claims.

29

## II. SUMMARY JUDGMENT DISMISSING ROLAND'S RETALIATION CLAIM IS APPROPRIATE BECAUSE SHE DID NOT ENGAGE IN PROTECTED ACTIVITY AND UNITY TERMINATED HER EMPLOYMENT FOR REFUSING TO MAKE A PATIENT VISIT.

The FLSA makes it unlawful for an employer to discharge or otherwise discriminate against an employee "because such employee has filed any complaint or instituted or caused to be instituted any proceeding…under this chapter". 29 U.S.C. § 215(a)(3). Roland contends that Unity violated the FLSA's anti-retaliation provision by discharging her for filing a complaint "under or related to" the FLSA. Complaint, ¶ 46.

To make out a claim of retaliation under § 215(a)(3), Roland can proceed under either the direct or indirect method of proof. *Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 810 (7th Cir. 2005). However, because Roland could not identify *any* direct evidence that Unity terminated her because of her "complaints" about Unity's call schedule, a claim under the direct method necessarily fails. (DPFOF, ¶¶131-133; Roland Depo., pp. 151:3-25; 152:1-25; 153:1-11; 187:2-25; 188-192; 193:1-3).[6]

With respect to the indirect method, Roland must first establish a prima facie case of retaliation. To make out a prima facie case, Roland must demonstrate the following: (1) that she engaged in statutorily protected activity by filing a complaint under the FLSA; (2) she was performing her job in a satisfactory manner; (3) despite her satisfactory performance, she was subjected to an adverse employment action; and (4) no other similarly situated employee who did not file a charge was subjected to the adverse employment action. *See, Cichon* at 812 (citing *Stone v. City of Indianapolis Pub. Util. Div*., 281 F.3d 640, 644 (7th Cir. 2002).[7]

---

[6] Not only does Roland fail to present any evidence to suggest that Unity terminated her employment because of her complaints about Unity's call schedule, it does not appear that Roland herself even believed that her complaints were the basis for her termination. When asked why she believed Unity terminated her employment, Roland replied "I'm not sure". (Roland Depo., pp. 186:24-25; 187:1).

[7] Notably, in *Stone,* the Seventh Circuit clarified that a plaintiff is not required to establish causation in order to make out a prima facie case of discrimination under the indirect method of proof. 281 F.3d at 644.

Case 1:07-cv-01103-WCG   Filed 05/15/09   Page 30 of 41   Document 29

If Roland establishes her prima facie case, the burden shifts to Unity to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 559 (7th Cir. 2004). If Unity identifies a legitimate, non-discriminatory reason, summary judgment in its favor is appropriate unless Roland can create a material issue of fact as to whether Unity's proffered reason is a pretext for retaliation. *Id.* Importantly, Roland has the ultimate burden of proof to demonstrate that Unity engaged in retaliatory conduct. *Cichon*, 401 F.3d at 815 (citing *David v. Caterpillar, Inc.*, 324 F.3d 851, 858 (7th Cir. 2003)).

As the following will demonstrate, Unity did not violate the FLSA's anti-retaliation provision in terminating Roland's employment. First, Roland cannot establish a prima facie case of retaliation because she has not engaged in protected activity and was not performing to Unity's expectations. Second, even if Roland could establish a prima facie case of retaliation, Unity had a legitimate, non-discriminatory reason for terminating her employment. Specifically, Roland failed to meet Unity's patient care standards by refusing to make a patient visit when one should have been made. Finally, Roland has not produced any evidence to suggest that Unity's stated reason for terminating her is a pretext for retaliation. Accordingly, summary judgment in favor of Unity is appropriate.

A.     **Roland Cannot Establish a Prima Facie Case of Retaliation.**

As outlined above, to establish a prima facie case of retaliation, Roland must demonstrate that: (1) she engaged in statutorily protected activity by filing a complaint under the FLSA; (2) she was performing her job in a satisfactory manner; (3) despite her satisfactory performance, she was subjected to an adverse employment action; and (4) no similarly situated employee who did not file a charge was subjected to the adverse employment action. *See, Cichon*, 401 F.3d at 812 (citing *Stone*, 281 F.3d at 644). A plaintiff's "failure to satisfy any one element of the prima

facie case is fatal to [her] retaliation claim." *Hudson*, 375 F.3d at 560 (citing *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002)).

Unity does not dispute that Roland's termination constitutes an adverse employment action. However, Roland's retaliation claim must fail because she cannot establish the remaining three elements of her prima facie case.

1.    **Roland has not engaged in protected activity under the FLSA**.

First, Roland did not engage in statutorily protected activity. The FLSA's anti-retaliation provision provides that it shall be unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee *has filed any complaint* or *instituted or caused to be instituted any proceeding* under or related to this chapter…" 29 U.S.C. §215(a)(3) (emphasis added).

The Seventh Circuit has not directly addressed what constitutes protected activity under § 215(a)(3)'s "filed any complaint" language. *See, Crowley v. Pace Suburban Bus Division of the Reg. Transp. Auth.*, 938 F.2d 797, 798 n. 3 (7th Cir. 1991). Roland may contend that internal complaints to a supervisor are sufficient to trigger the protections of the Act. However, such interpretation is contrary to the plain language of the statute, which "must ordinarily be regarded as conclusive." *Sapperstein v. Hager*, 188 F.3d 852, 857 (7th Cir. 1999). The statute's use of the words "filed", "instituted", and "proceeding" clearly refer to the initiation of a charge or lawsuit. Indeed, Black's Law Dictionary defines the word "filed" as the commencement of a lawsuit. *See*, Black's Law Dictionary (8th ed. 2004).

To conclude that the statute contemplates the protection of internal complaints would render the statute's use of the word "filed" superfluous. (*See, Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 609 (holding that "statutory interpretations that render superfluous other provisions in the same enactment are strongly disfavored"). Thus, the plain and unambiguous

language of § 215(a)(3) demonstrates that the statue protects only the filing of formal complaints with a labor agency or court. Other courts, including the Second and Fourth Circuits, have reached this conclusion, holding that an employee's oral complaint to a supervisor was not protected activity because it was not a formal complaint filed with a labor agency or court. *See, Lambert v. Genesee Hospital*, 10 F.3d 46, 55 (2d. Cir. 1993). *Ball v. Memphis Bar-B-Q Co. Inc.*, 228 F.3d 360, 364 (4th Cir., 2000).[8]

Moreover, although it has not ruled on the issue directly, Seventh Circuit cases holding that the employee did engage in protected activity under the FLSA have involved plaintiffs who filed a lawsuit or formal complaint with the Department of Labor. *See, e.g., Cichon*, 401 F.3d at 812 (plaintiff engaged in protected activity by filing lawsuit under FLSA); *Sapperstein*, 188 F.3d at 854 (plaintiff engaged in protected activity by filing a complaint with Illinois Department of Labor). Significantly, Roland did not file a charge or commence a lawsuit under the FLSA until approximately eight months *after* her employment with Unity was terminated.[9] (DPFOF, ¶¶177). Accordingly, Roland did not engage in protected activity under the FLSA.

Furthermore, no matter what form the complaint takes (oral or written, formal or informal), it has to allege a violation of the FLSA in order to trigger the protection of the Act. In other words, the employee has to frame his complaints in terms of the potential illegality of the employer's actions. *See, Hagan v. Echostar Satellite*, 529 F.3d 617,626 (5th Cir. 2008).

---

[8] Respondent has located two federal district court opinions from Wisconsin interpreting this issue and reaching different conclusions. *See, Hernandez v. City-Wide Insulation of Madison, Inc.*, 508 F.Supp. 2d 682 (E.D. Wis. 2007) (holding that §215(a)(3) protects informal complaints (oral or written) made to employer); *Kasten v. Saint-Gobain Performance Plastics Corp.*, No. 07-CV-686-bbc, 2008 WL 2489925 (W.D. Wis., June 19, 2008) (holding that internal complaints must be in writing and delivered to the employer to be protected under §215(a)(3)).

[9] In fact, Roland did not file a charge or lawsuit under the FLSA until her previous age discrimination charge, filed against Unity subsequent to her termination, was dismissed on a finding of no probable cause. Although provided the opportunity, Roland's earlier age discrimination charge made no mention of Roland's belief that she was terminated for making complaints about Unity's call schedule. (Roland Depo., pp. 193:23-25; 194-198: 199:1-10: 201:4-25; 202-216; 217:1-17, Exs. 1008, 1009, 1010, 1011). Roland's new allegations and sudden switch in legal theories are opportunistic and demonstrate that her FLSA claims have no merit.

Additionally, the complaint must reference the FLSA "if not by name, then by reference to something regulated by the FLSA." *Hernandez,* 508 F. Supp. 2d at 690 (citing *Moore v. Freeman*, 355 F.3d 558, 568 (6th Cir., 2004); *Lambert v. Ackerly*, 180 F.3d 997, 1007-1008 (9th Cir., 1999); *EEOC v. White & Son Enters.*, 881 F.2d 1006, 1008 (11th Cir., 1989); *Brennan v. Maxey's Yamaha*, 513 F.2d 179, 181 (8th Cir., 1975). Importantly, however, Roland acknowledged that she never complained to anyone within Unity management that its call policy violated the law. (DPFOF, ¶134).

The only complaints that Roland raised regarding Unity's call policy were: (1) she was scheduled for too many call shifts; and (2) her call shifts were scheduled too close together. (DPFOF, ¶¶120-128).[10] Yet the FLSA does not regulate the number of hours/shifts an employee is scheduled to be on call, nor does the FLSA regulate or address the frequency of call shifts. Thus, Roland's "complaints" do not even concern an issue regulated by the FLSA. Accordingly, Roland has not engaged in protected activity under the FLSA.

### 2. Roland was not performing her job in a satisfactory manner.

The undisputed facts demonstrate that Roland was failing to meet Unity's legitimate performance expectations at the time of her termination. Indeed, in the months preceding her termination, Roland was cited for a number of performance and disciplinary issues. (DPFOF, ¶¶ 136-142). Most notably, in January 2007, Roland received a disciplinary warning for: (1) failing to meet Unity's requirement that nurses spend 40% of their work time directly with patients; and (2) failing to get her weekly schedule in the computer "per policy". (DPFOF, ¶138). Roland's direct care percentage at the time of the disciplinary warning was 22%; considerably below

---

[10] Roland's other complaints related to Unity's charting requirements. (Roland Depo., pp. 144:7-25: 145:1-25: 146:1-25, Ex. 1004).

Unity's requirement. (DPFOF, ¶138; Braspennickx Depo., p. 84:2-10). As of the date of her termination, Roland was still not in compliance with Unity's 40% guideline. (DPFOF, ¶139).

Despite her documented performance issues, the deciding factor in Unity's decision to terminate Roland was her failure to make a patient visit on the morning of April 1, 2007. (DPFOF, ¶143). At that time, Roland was treating FK, a terminally ill patient with a cancerous tumor in his throat. (DPFOF, ¶145). At 3:25 a.m. on the morning of April 1, 2007, Unity received a call from FK's wife Dorothy, which resulted in Roland speaking with Dorothy. During this call, Dorothy indicated that FK had been up for three hours, was "very restless," was "undressing and had tremors," and that someone should know of his condition. (DPFOF, ¶ 152). Despite the fact that FK's family had called on two occasions within the past 24 hours, and that Roland had documented that the family was scared and concerned about his condition, Roland elected not to make a patient visit. (DPFOF, ¶¶144-151). In fact, rather than visit FK to assess his condition, Roland merely instructed his wife to give him additional medication, and told her that another nurse would call in the morning. (DPFOF, ¶153-154). Roland made this recommendation despite the fact that Dorothy was scared and had previously indicated that she was hesitant to give FK the prescribed medication. (DPFOF, ¶153). Roland then left a voicemail message on Unity's system regarding FK for the next nurse on duty. (DPFOF, ¶¶155-156).

On the morning of April 1, Unity's Visit Coordinator, Diana Royer ("Royer") listened to Roland's message about FK and his wife. (DPFOF, ¶157). Royer concluded that, based on the patient's condition, a visit should have been made. (DPFOF, ¶158). Royer reported the situation to her supervisor, Braspennickx, who looked into the matter. (DPFOF, ¶159). Braspennickx reviewed Roland's treatment notes and also discussed FK's condition with other nurses who had

been treating him at the time. (DPFOF, ¶160). Upon the completion of her review, Braspennickx agreed that a visit should have been made because both the patient and his family needed support. (DPFOF, ¶161-162). Braspennickx reported her concerns to Unity's Executive Director, Nicole Curran ("Curran"), and Human Resources Director, Jackie Berger ("Berger"). (DPFOF, ¶163).

Curran, Berger, and Braspennickx discussed the situation and reviewed Roland's treatment notes from March 31 and April 1, 2007. (DPFOF, ¶¶164-165). Based on their review of such documentation, Curran, Berger, and Braspennickx concluded that there was no legitimate basis for Roland's failure to make a visit on April 1, 2007 and, as a result, Roland's employment should be terminated. (DPFOF, ¶¶166-167).

The above clearly demonstrates that Roland was terminated for failing to perform in accordance with Unity's patient care standards. Thus, because she was not performing to Unity's legitimate expectations, Roland cannot establish her prima facie case, and her retaliation claim fails.

3. **Roland cannot identify other similarly situated employees who did not raise complaints about Unity's call policy**.

Finally, to establish a prima facie case of retaliation, Roland must establish that similarly situated employees who did not complain were not subjected to an adverse employment action. *See, Cichon*, 401 F.3d at 812 (citing *Stone*, 281 F.3d at 644). To do so necessarily requires that Roland identify other similarly situated Unity employees who did not file complaints. Significantly, however, Roland has testified that *all* the employees she worked with at Unity's Marinette office made complaints about the call schedule. (Roland Depo., pp. 137:16-25; 138:1-5). Roland acknowledges that none of these employees were terminated during her employment at Unity. (Roland Depo., pp. 139:2-4). Accordingly, because Roland cannot identify *any* other

similarly situated employees who did not make complaints about Unity's call policy, she cannot make out a prima facie case of retaliation.

**B.      Unity Had Legitimate, Non-Discriminatory Reasons for Terminating Roland's Employment.**

Assuming, *arguendo*, that Roland could establish a prima facie case of retaliation, the burden shifts to Unity to offer a legitimate, non-discriminatory reason for her termination. *Cichon*, 401 F.3d 803 (7th Cir. 2005). As clearly outlined above, Roland was terminated for failing to meet Unity's patient care standards when she elected not to make a patient visit under circumstances where one was required. *See*, Section II(A)(ii) *supra*. The fact that Roland had complained about call played no role whatsoever in Unity's decision to terminate her employment. (DPFOF, ¶168). As such, summary judgment in its favor is warranted unless Roland offers evidence sufficient to create "an issue of material fact as to whether [Unity's] proffered reasons for [terminating her were] merely pretext…retaliation." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004).

**C.      The Undisputed Facts Do Not Reveal Any Evidence of Pretext.**

In order to demonstrate a material issue of fact as to pretext, Roland must show that Unity's proffered reason for terminating her was a pretext "for a decision based on some other undisclosed ground." *Forrester v. Rauland-Borg Corp.,* 453 F.3d 416, 417 (7th Cir., 2006). "Pretext is more than a mistake on the part of the employer; it is a phony excuse." *Hudson*, 375 F.3d at 561 (citing *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998).

Incredibly, Roland has not identified *any* evidence to suggest that Unity's proffered reason for terminating her is a pretext for retaliation. (DPFOF, ¶¶120-133; Roland Depo., pp. 151:3-25; 152:1-25; 153:1-11; 187:2-25; 188-192; 193:1-3). Roland admits that no one at Unity ever made any statements which she interpreted as hostile or which suggested that her job was in

37

jeopardy because she had raised concerns about the call schedule. (DPFOF, ¶131).

Additionally, Roland was never subjected to any discipline following a complaint she made

regarding Unity's call schedule. (DPFOF, ¶132). When pressed to identify what evidence she

had to suggest that Unity terminated her based on her complaints regarding its call policy,

Roland cited only the following: (1) she had repeated her concerns regarding poor call schedules

throughout the duration of her employment; and (2) Unity did not provide her answers when she

inquired about the poor call schedule. (DPFOF, ¶133). Clearly, such evidence does not even

come close to establishing a material issue of fact as to whether Unity's proffered reason was a

pretext for retaliation.

Many plaintiffs attempt to establish pretext by pointing to a short lapse of time between

the filing of a complaint and the adverse employment action. While not independently sufficient

to establish pretext, the timing of events is "often an important evidentiary ally of the plaintiff",

*Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001), which may allow [her] "to survive

summary judgment provided that there is also other evidence that supports the inference of a

causal link." *Lang v. Ill. Dept. of Children & Family Ser.*, 361 F.3d 416, 419 (7th Cir. 2004).

In the present case, however, the timing of Roland's complaints and her termination do

not give rise to an inference of retaliation. Roland acknowledges that she began making

complaints regarding Unity's call policy within the first six months of her employment.

(DPFOF, ¶120). Notwithstanding such complaints, Roland was employed at Unity for almost

three years. (DPFOF, ¶¶46, 135). The fact that Unity continued to employ Roland for more than

two years after she began raising complaints regarding Unity's call policy clearly demonstrates

that her termination is not a pretext for retaliation.

Moreover, many Unity nurses have made complaints about the amount of call. (DPFOF, ¶129). In fact, Roland alleges that *all* of the nurses she worked with in the Marinette office complained about Unity's call schedule. (Roland Depo., pp. 137:16-25; 138:1-5). Significantly, however, Roland cannot identify a single nurse in the Marinette office that was terminated during her employment. (Roland Depo., pp. 139:2-4). The fact that many other nurses complained but were not terminated further establishes that Unity's proffered reason for terminating Roland is not a pretext for retaliation.

In addition, following her termination, Roland asserted that Unity terminated her employment because of her age. (DPFOF, ¶169-176). Indeed, on one of her age complaints, Roland was asked if she was owed any overtime or minimum wage compensation from Unity and she indicated that she was not making such a claim. (DPFOF, ¶¶170-171). It was not until several months had passed following the termination of her employment and the dismissal of her age discrimination claim, that Roland came up with the claim that Unity violated the FLSA and terminated her employment because she complained about on-call time. (DPFOF, ¶¶169-177). Obviously, Roland's failure to assert her FLSA and retaliation claims until months after her termination and only after her age claim failed, shows that her present claims are not credible.

Finally, it is important to note that whether Roland genuinely believed that a patient visit was unnecessary on April 1, 2007 is entirely irrelevant to the present analysis. It is clearly within an employer's right to establish, monitor, and enforce employee performance standards. Indeed, the Seventh Circuit has consistently held that it will not "sit as a super-personnel department that reexamines an entity's business decisions." *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986). Thus, Unity acted entirely within its discretion in determining that

a visit should have been made, and that Roland's failure to make a visit warranted her termination.

As demonstrated above, Roland has failed to present any evidence to support her allegation that Unity terminated her for complaining about its call policy.  The courts "have typically been wary of allegations based on nothing [more than a bold statement] in an attempt to come up with a conspiracy theory and in particular where there is not a scintilla of evidence in the record…"  *Cichon*, 401 F.3d at 814 (citing *Wells v. Unisource Worldwide, Inc*., 289 F.3d 1001, 1007 (7th Cir. 2002).  Because Unity terminated Roland for failing to make a patient visit, and because Roland has offered nothing more than her own bold assertion that Unity retaliated against her, summary judgment in favor of Unity is appropriate.

## CONCLUSION

Summary judgment dismissing all of the Plaintiffs' claims against Unity is warranted. First, as to the allegations regarding Unity's on-call policy, the undisputed facts demonstrate that the Plaintiffs were able to devote their on-call time to the "ordinary activities of private life." *Dinges*, 164 F.3d at 1057.  Indeed, while on-call, the Plaintiffs and other Unity nurses were able to pursue many personal activities, travel freely within the Marinette service area, and were not subjected to a burdensome amount of calls or an unduly restrictive response time.  Clearly, the Plaintiffs' on-call time was not predominately for the benefit of Unity.  *Armour*, 323 U.S. at 133. As a result, the Plaintiffs are not entitled to additional compensation under the FLSA.

Second, with respect to Roland's retaliation claim, the undisputed facts demonstrate that she cannot establish her prima facie case.  Roland did not engage in protected activity and was not performing in accordance with Unity's legitimate performance expectations at the time of her termination.  Furthermore, even if Roland could establish her prima facie case, her retaliation claim fails because Unity terminated her for a legitimate, non-discriminatory reason.

Specifically, Roland was terminated for failing to make a patient visit on April 1, 2007. Because Roland has not presented any evidence to suggest that this reason is phony or a pretext for retaliation, summary judgment in favor of Unity is warranted.

Dated this 15 day of May, 2009.

s/Annie L. Raupp
John A. Haase
State Bar No. 1027536
Annie L. Raupp
State Bar No. 1070855
GODFREY & KAHN, S.C.
333 Main Street, Suite 600
Post Office Box 13067
Green Bay, WI 54307-3067
Phone: 920-432-9300
Fax: 920-436-7988
Email: jhaase@gklaw.com

Attorneys for Defendant, Unity Limited
Partnership

3756098_2