UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN

PATRICIA J. ROLAND,

    Plaintiff,

    v.

Case No. 07-C-1103

UNITY LIMITED PARTNERSHIP,

    Defendant.

**DEFENDANT'S REPLY BRIEF IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

Plaintiffs' 69 page brief in Opposition to Unity Limited Partnership's ("Unity") Motion for Summary Judgment ("Opposition Brief")[1] is filled with untimely claims, distorted facts and irrelevant standards. The only thing Plaintiffs' Opposition Brief does not provide is any material evidence to meet their burden in opposing summary judgment. Plaintiffs have not overcome the overwhelming evidence which establishes that Unity nurses are able to engage in personal activities while on-call such that on-call hours do not constitute compensable "hours worked" under the FLSA. Similarly, Plaintiffs have not offered any evidence to suggest that Roland was terminated in retaliation for exercising rights protected under the FLSA. As a result, Unity's Motion for Summary Judgment on all claims must be granted.

---

[1] Plaintiffs' 69 page Opposition Brief is far in excess of what is allowed under Local Rule 7.1(f). The Plaintiffs will likely argue that their Opposition Brief complies with L.R. 7.1(f) because the designated argument section is only 29 pages long (pp. 1-5, 45-69), and the remaining 40 pages (pp. 5-45) fall under the heading "Undisputable Material Facts", which do not count towards the maximum page limit. However, a thorough examination of Plaintiffs' Brief makes clear that they are trying to create an end run around the local rules. Large sections of the Brief's "fact" section argue substantive points. For example, pages 15-21 argue why nine of the affidavits Unity offered in support of its Motion should not be considered persuasive evidence. Pages 31-35 argue that Plaintiffs are entitled to compensation because of the amount of work they were "required" to perform while on call. Pages 42-45 of the Brief argue that Unity's stated reason for terminating Roland was pre-textual. Accordingly, the Court should disregard those portions of Plaintiffs' Brief that exceed the page limit.

## II. UNITY IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFFS WERE ABLE TO EFFECTIVELY ENGAGE IN PERSONAL ACTIVITIES WHILE ON-CALL.

The Plaintiffs' overarching theme is that Unity misconstrued the analysis outlined in *Dinges v. Sacred Heart St. Mary's Hospitals, Inc.* 164 F.3d 1056, 1058 (7th Cir. 1999). Specifically, Plaintiffs contend that Unity ignores the Court's functional approach which focuses on how employees are able to spend call hours. Significantly, however, it is Plaintiffs who misconstrue Unity's argument. Unity does not dispute that *Dinges* focuses on determining what employees are able to do while on call. Rather, it is the Plaintiffs who ignore undisputed facts which demonstrate that Plaintiffs were able to engage in a wide variety of personal pursuits while on-call. Accordingly, summary judgment in favor of Unity must be granted.

### A. The fact that Plaintiffs may have performed work during 90% of call shifts does not establish that all on-call hours are compensable under the FLSA.

Plaintiffs' primary argument centers on their assertion that Plaintiffs were required to perform work during 90% of their call shifts. The Plaintiffs allege that this percentage is dispositive and somehow establishes that they were "per se" engaged to wait.[2]

It is important to note, however, that the Plaintiffs' argument regarding the percentage of call shifts with hours worked tells only a small part of the story. Significantly, the mode[3] hours worked while on-call for both Roland and Breecher was zero. (Supplemental Affidavit of Jacalyn Berger [hereinafter, "Suppl. Berger Aff."], ¶¶ 23, 24, Exs. C & D). Also, the estimate of some work on 90% of the call shifts includes time that Unity nurses spend voluntarily charting

---

[2] As an initial matter, Plaintiffs' entire argument on the compensability of call hours is, with slight exception, lifted verbatim from pages 30-35 of their Brief in Support of Motion for Partial Summary Judgment. Rather than waste the Court's time by repeating the same responses to such arguments, Unity respectfully asks that the Court refer to pages 6-12 of its Brief in Opposition to Plaintiffs' Motion for Partial Summary Judgment, filed October 15, 2009.
[3] In statistics, the mode is the value or number that occurs most frequently in a data set. The American Heritage College Dictionary 876 (3d ed. 1993).

and time nurses spend performing duties scheduled in advance of the call shift, such as patient assessments. (DPFOF, ¶¶ 36, 37; Curran Depo., p. 28:10-21).

Plaintiffs argue that their performance of these pre-scheduled activities in addition to emergency duties somehow establishes that they were "per se" unable to engage in personal activities for the entirety of the call shift, and thus are entitled to compensation. Plaintiffs' argument in this regard misses the mark.

First, the Plaintiffs offer no authority to support the proposition that having some prescheduled work or voluntary work during a call shift converts the entire call shift into "hours worked" under the FLSA. For example, Ms. Curran estimated that 30-40% of a nurse's on-call patient visits are known in advance of the call shift. (DPFOF, ¶ 39). In such instances, Plaintiffs know they will be required to work during certain hours, and, accordingly, can schedule personal activities around such duties. In other words, the length of the call shift is simply shortened and replaced by pre-scheduled non-call work time. This is the exact type of schedule that most Unity nurses work throughout the business week (7:00 a.m.-5:00 p.m. regular shift followed by 5:00 p.m.-7:00 a.m. call shift). Thus, the effect of having some pre-planned regular hours on a call shift is simply to reduce the length of the call shift, not to convert all call time into hours worked.

With regard to charting during call shifts, Plaintiffs twist the facts and contradict their own prior admissions. Plaintiffs contend that they were <u>required</u> to chart while on-call because of Unity's requirement that charting be completed within 24 hours of a patient visit. However, it is undisputed that nurses have 72 hours to complete most charting duties. (Suppl. Berger Aff., ¶ 19). Only assessments and medication changes must be charted within 24 hours. (Suppl. Berger Aff., ¶ 19). Most of the time, nurses can chart at the end of a call shift or wait until the next regular shift to complete this charting. (Suppl. Berger Aff. ¶ 19). Given Unity's requirements,

only a small percentage of Plaintiffs' charting duties would ever have to be completed during a call shift. (Suppl. Berger. Aff., ¶ 19).

Thus, the Plaintiffs voluntarily elected to chart during a call shift. Given that nurses are compensated at 1 ½ times their regular rate of pay for all work performed during a call shift (DPFOF, ¶ 20), there is an obvious financial incentive to do so. Plaintiffs themselves admitted that they voluntarily charted while on-call (DPFOF, ¶ 40). Additionally, Plaintiffs' Brief even acknowledges that "Sometimes, nurses planned, at their option, to do charting during a call shift." (Plaintiffs' Opposition Brief, p. 29).

Nonetheless, Plaintiffs maintain that the fact that they perform a combination of voluntary, pre-scheduled and/or emergency work during a portion of 90% of their call shifts "per se" establishes that they are entitled to compensation for the entire call shift. But that is clearly not contemplated under the FLSA. Rather, the appropriate inquiry under *Dinges* is to look at whether outside of the pre-scheduled and voluntary duties (for which Plaintiffs were paid time and a half), Plaintiffs were "called away every few hours" such that they were unable to engage in any personal activities during the time they were on call. *Dinges*, 164 F.3d at 1058. The answer to this question is "no."

Plaintiffs point to one call shift (12/23/05-12/24/05) where Roland was called twice and worked six hours as conclusive evidence that Plaintiffs are called away every few hours and thus unable to engage in personal activities. However, borrowing the Plaintiffs' vernacular, this call shift cannot be examined in a "vacuum." In focusing on this single instance, Plaintiffs ignore undisputed evidence averaging Plaintiffs' experience over the entire course of their employment with Unity. Such evidence demonstrates that they were not the type of employees who were frequently interrupted and unable to engage in personal pursuits. For example, on half of her call

shifts (47%), Roland received zero calls. (DPFOF, ¶ 73). On shifts that she did receive calls, Roland was only required to make a visit 33% of the time. (DPFOF, ¶ 74). Throughout her employment, Roland received an average of only .98 calls per shift. (DPFOF, ¶ 72).

Additionally, even considering charting and other pre-scheduled call shift duties, Roland only worked an average of 3.5 hours per call shift. (Suppl. Berger Aff., ¶ 23, Ex. C). Quite significantly, Roland's mode number of work hours per call shift was zero. (Suppl. Berger Aff., ¶ 23, Ex. C). On 96% of her call shifts, Roland recorded no work hours between 10:00 p.m. and the end of the call shift. (Suppl. Berger Aff., ¶23, Ex. C). Clearly, Roland's allegations regarding how often her sleep was interrupted by calls are vastly exaggerated.

Breecher's experience was substantially similar. Breecher received no calls on 38% of his call shifts. (DPFOF, ¶ 104). Breecher averaged .98 calls per call shift over the course of his employment with Unity. (DPFOF, ¶ 103). Factoring in time spent charting and performing pre-scheduled visits, Breecher worked an average of 3.3 hours per call shift. (Suppl. Berger Aff., ¶ 24, Ex. D). Like Roland, Breecher's mode number of work hours per call shift was zero. (Suppl. Berger Aff., ¶ 24, Ex. D). On 72% of his call shifts, Breecher performed no work between 10:00 p.m. and the end of the call shift. (Suppl. Berger Aff., ¶ 24, Ex. D)

What the above-cited statistics undeniably demonstrate is that Plaintiffs were not constantly being called away to work. The "factual realit[y]" of the present case is that, while Plaintiffs sometimes perform voluntary or pre-scheduled duties during call shifts, they could schedule personal activities around these duties, and were compensated at 1 ½ times their regular wage for such time. (DPFOF, ¶ 20). For the majority of the call shifts, however, Plaintiffs were not interrupted and were free to engage in whatever personal activities they desired. Such

5

conclusion is consistent with the testimony of 11 Unity nurses who confirmed that they are able to engage in a virtually unlimited array of personal activities while on-call. (DPFOF, ¶ 24).

Despite Plaintiffs' attempts to mischaracterize their on-call workload and schedule, it is clear that they were not called away every few hours, but rather were admittedly free to use call time for personal pursuits such as watching TV and visiting with friends and family. (DPFOF, ¶¶31 , 83, 98). Because Plaintiffs could use call time effectively for their own purposes, their on-call hours do not constitute "hours worked" under the FLSA. *Dinges*, 164 F.3d at 1058.

B. **Plaintiffs' attempt to bar summary judgment in favor of Unity by discrediting the affidavits of nine nurse affiants fails**.

In support of its Motion for Summary Judgment, Unity submitted affidavits from eleven of its employees. Such affidavits are very problematic for Plaintiffs because they confirm that other Unity employees are able to engage in personal activities while on-call. (DPFOF, ¶24). In an effort to prevent summary judgment in favor of Unity, Plaintiffs' Opposition Brief employs two failed strategies to refute the testimony of the nurse affiants.

First, in the "fact" section, Plaintiffs argue that nine of the affidavits are distinguishable. Plaintiffs allege that five of these nine affiants hold different positions than Roland (RN) and Breecher (LPN). Specifically, Plaintiffs allege that Laura Frea, Mary Pichette and Tami Arnold were CNAs, and Debbie Trossen and Diana Royer worked in administration. Plaintiffs never point out the significance of such distinction, but one can assume they are arguing that the affidavits somehow carry less weight because the affiants hold different positions. Plaintiffs' argument in this regard is both inaccurate and irrelevant.

Like Roland, Diana Royer, Chris Mlnarik, Patti Wagner, Debbie Trossen and Eileen Mertz all worked as primary nurses in Marinette during their employment with Unity.[4] (Royer Aff., ¶ 2; Mlnarik Aff., ¶ 1; P. Wagner Aff., ¶ 1; Trossen Aff., ¶ 1; Mertz Aff., ¶ 1). Like Breecher, Dan Pichette worked as a LPN in the Marinette service area. (D. Pichette Aff., ¶ 1). Thus, even assuming that the distinction mattered, six of the nine affiants have held the same positions and worked in the same service area as the Plaintiffs.[5] These employees cared for many of the same patients, covered the same territory and worked out of the same office as the Plaintiffs. Each of these six affiants attested to the wide variety of personal activities they are able to engage in while on-call. (Royer Aff., ¶ 11; Mlnark Aff., ¶¶ 9, 11; P. Wager Aff., ¶¶ 8-12; Trossen Aff., ¶¶ 9-10; Mertz Aff., ¶¶ 7-8; D. Pichette Aff., ¶ 8).

Plaintiffs attempt to distinguish the remaining affidavits on the basis that the nurses do not specify the time period during which they are able to engage in personal activities. Plaintiffs contend this is significant because Unity hired additional nurses after their employment ended, which allegedly eased the burden of call duties. Unity acknowledges that it has hired one additional primary nurse in its Marinette office since Plaintiffs left Unity. (Second Supplemental Affidavit of Jacalyn Berger [hereinafter, "Sec. Suppl. Berger Aff."], ¶ 6). Importantly, however, this hire was necessitated by a corresponding increase in Unity's daily census of patients. (Sec. Suppl. Berger Aff., ¶¶ 4-6). Since Plaintiffs left Unity, the average number of patients per day

---

[4] Plaintiffs make much of the fact that Ms. Trossen and Ms. Royer currently hold administrative positions. Significantly, Ms. Royer worked as a primary nurse in Unity's Marinette region for 6 of the last 9 years. Similarly, Ms. Trossen worked as a primary nurse in Marinette for 5 of the last 8 years. As discussed below, the fact that they were not primary nurses during the alleged statute of limitations period is irrelevant.

[5] If Plaintiffs believe that the nurse affiants' testimony is irrelevant because some of them worked in different positions than the Plaintiffs, then they should note that: (1) the Plaintiffs themselves held different positions; and (2) one of the two rebuttal witnesses Plaintiffs identified, Mr. Thomas Wade, worked in an entirely different service area (Sturgeon Bay) than either of the Plaintiffs.

has grown from 31 to 48. (Sec. Suppl. Berger Aff., ¶¶ 4-5). Thus, the nurse to patient ratio is the same now as when Plaintiffs were employed at Unity. (Sec. Suppl. Berger Aff., ¶ 7).

Plaintiffs also attempt to discredit the affidavits of Dan and Mary Pichette by arguing that such affidavits are inconsistent with their subsequent deposition testimony. Plaintiffs point out that the Pichette's affidavits attest to the wide variety of personal activities they can engage in while on-call, whereas their deposition testimony states that they usually stayed home.

Such testimony is in no way inconsistent. The Pichettes both testified that they are able to and do engage in many personal activities while on call, such as visiting family, running errands, and going out to dinner. (M. Pichette Aff., ¶ 7; D. Pichette Aff., ¶ 8). Nevertheless, it is within the employee's discretion to decide how to spend their call time on any given day. Many people enjoy spending their time off at home relaxing and catching up on household chores. The fact that the Pichettes choose to do so while on-call, even though they are able to engage in other activities, does not somehow render their testimony less credible.

Next, to refute the testimony of the affiants, Plaintiffs offered affidavits from two former Unity employees; Evelyn Dieck and Thomas Wade. The affidavits allege that Wade and Dieck felt restricted by Unity's call policy and did not engage in personal activities while on-call.

As an initial matter, Wade's affidavit is of no relevance to determining the call activities of Marinette nurses because Wade worked in an entirely different territory (Sturgeon Bay) than the Plaintiffs (Marinette).[6] With respect to the substance of the affidavits, the undisputed evidence suggests that Dieck's and Wade's broad allegations about their inability to engage in personal activities on-call are overstated. Both Dieck and Wade worked at Unity for less than a year. Dieck worked a total of 44 call shifts during her employment, which averages out to approximately 5 call shifts per month. (Sec. Suppl. Berger Aff., ¶ 12). Dieck voluntarily picked

---

[6] All of Unity's nurse affiants work in the Marinette region.

up 6 of these 44 call shifts (14%). (Sec. Suppl. Berger Aff., ¶ 12). On 50% of her call shifts, Dieck received zero calls; on 80% of her call shifts, Dieck received 1 or fewer calls. (Sec. Suppl. Berger Aff., ¶ 13). Dieck averaged only .84 calls per shift throughout the entire course of her employment with Unity. (Sec. Suppl. Berger Aff., ¶ 13).

Turning to Wade, his timecards reveal that on 61% of his call shifts he received zero calls; on 86% of call shifts Wade received one or fewer calls. (Sec. Suppl. Berger Aff., ¶ 15). Wade averaged .68 calls per shift during his employment at Unity. (Sec. Suppl. Berger Aff., ¶ 15). Thus, like the Plaintiffs, the actual statistics show Dieck and Wade were free to engage in personal activities while on call, but apparently chose not to do so.

In sum, despite Plaintiffs' attempt to discredit the affiants, their testimony and the statistics describing Plaintiffs', Wade's and Dieck's on-call experiences confirm that Unity's nurses are free to engage in personal activities while on-call. Accordingly, on-call hours are not compensable "hours worked," and summary judgment in favor of Unity is warranted.

### III. THE FACT THAT PLAINTIFFS WERE PAID $2.00/HOUR FOR CARRYING THE PAGER AND CELL PHONE DOES NOT ESTABLISH AN INDEPENDENT VIOLATION OF THE FLSA'S MINIMUM WAGE PROVISIONS.

Section 206 of the FLSA requires that employers pay their employees the federal minimum wage for all hours worked. 29 U.S.C. § 206(a). On pages 63-64 of their Brief, Plaintiffs summarily assert that the fact that Unity paid them $2.00/hour for on-call hours where they did nothing more than carry a pager and cell phone establishes an independent violation of the FLSA's minimum wage provisions. Even assuming, *arguendo*, that all on-call hours constitute compensable "hours worked" under Unity's policy, Plaintiffs have not provided sufficient information for the Court to conclude that a minimum wage violation has occurred.

In order to establish a minimum wage violation, Plaintiffs would have to provide detailed calculations which demonstrate that they received less than the minimum wage for each hour

9

worked (including all call scheduled call hours). First, Plaintiffs would have to determine the total number of hours they are claiming as hours worked for each given week. Next, Plaintiffs would have to identify how much compensation they received for each corresponding week. Only after dividing each weekly payment by the number of hours worked that week can the Plaintiffs determine whether they were paid the minimum wage for all hours worked. Plaintiffs have not produced any such evidence, but rather rely on unsupported and conclusory allegations. The evidence presented by Plaintiffs simply does not establish an independent minimum wage violation or prevent the Court from entering summary judgment in favor of Unity.

## IV. PLAINTIFFS' CLAIMS REGARDING REGULAR SHIFT PAY PRACTICES ARE UNTIMELY AND DEMAND COMPENSATION FOR OFF-DUTY TIME.

The Plaintiffs' arguments regarding the compensability of regular shift "wait time" is a word-for-word replication of pages 36-38 of Plaintiffs' Brief in Support of their Motion for Partial Summary Judgment. Again, rather than repeat its responses, Unity refers the Court to pages 18-23 of Unity's Brief in Opposition to Plaintiffs' Motion for Partial Summary Judgment.

## V. ROLAND HAS FAILED TO IDENTIFY ANY EVIDENCE WHICH SUGGESTS THAT UNITY'S STATED REASON FOR TERMINATING HER EMPLOYMENT WAS A PRETEXT FOR A RETALIATORY DISCHARGE.

In her Amended Complaint, Roland alleges that she was terminated in retaliation for activity protected by the FLSA. Roland made such allegation and perpetuated the claim, even though at her deposition she stated that she was "not sure" why Unity terminated her employment. (Roland Depo., pp. 186: 24-25; 187: 1). In Unity's primary Brief, it demonstrated that the undisputed facts show that Roland has not established a prima facie case of retaliation, and that Unity had legitimate non-discriminatory reasons for terminating Roland. As the following will demonstrate, Roland has failed to establish that she engaged in protected activity or that Unity's stated reasons for terminating her employment were a pretext for discrimination.

A.  **<u>Roland Has Failed to Establish a Prima Facie Case of FLSA Retaliation</u>**.

Roland cannot establish a prima facie case because the undisputed facts show that (1) Roland did not engage in activity protected by the FLSA; and (2) there are no similarly situated employees who were treated more favorably. With regard to protected activity, the FLSA provides that it is unlawful for an employer "to discharge or in any other manner discriminate against an employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding <u>under or related to this chapter</u>…" 29 U.S.C. §215(a)(3) (emphasis added). Thus in order to be protected activity, the "complaint" must allege a violation of the FLSA or at least something regulated by the FLSA. *Moore v. Freeman*, 355 F.3d 558, 568 (6th Cir. 2004). Moreover, to fall within the protections of the FLSA, a complaint must be in writing; verbal complaints do not fall within the protection of the Act. *Kasten v. St.-Gobian Performance Plastics*, No. 08-2820 (7th Cir. 2009).[7]

Roland cites to two documents which she contends represent protected activity under the FLSA. Both documents were titled as an "evaluation" form, which Unity asked Roland to fill out in conjunction with her annual performance evaluation. (Roland Depo., pp. 142: 8-23, Ex. 1004; 147:1015, Ex. 1005). The first "evaluation" form prepared by Roland is dated January 25, 2006. (See Braspennickx Depo., Ex. 6). One question on the form asked "what would cause you to leave?;" Roland wrote the following: "Poor schedules…" Obviously, nothing in this evaluation contains any reference to the FLSA or any matter regulated by the FLSA. The FLSA does not regulate schedules; rather, it regulates what constitutes "hours worked," the minimum wage and overtime wages. 29 U.S.C. §§ 206-207.

---

[7] After Unity filed its summary judgment motion, the Seventh Circuit Court of Appeals ruled that internal written complaints were sufficient and a complaint did not need to be filed in Court or with an agency to be protected.

Roland also points to an evaluation form she completed on or about December 29, 2006. Like the previous form, Roland again cited "poor schedules," "charting expectations" and "charting time frames" as reasons she would leave Unity. (Braspennickx Depo., p. 53, Ex. 9). Roland admitted that her complaint about poor schedules related to being scheduled for too many call shifts. (Roland Depo., pp. 143: 20-25; 144: 1-2). Also, Roland's reference to charting addressed her dissatisfaction that charting needed to be done within a certain time after patient contact, that she might sometimes have to do it after a shift ended and only get paid straight time, rather than time and one-half. (Roland Depo., pp. 145: 12-25; 146: 1-17).[8]

While it is true that the FLSA regulates when call time constitutes "hours worked" under the FLSA, the FLSA in no way regulates the frequency of call schedules or when patient charting needs to be performed. While Roland did not like how often she was scheduled for call shifts or when she needed to complete her charting, her "complaint" about such matters did not address issues regulated by the FLSA. Thus, she did not engage in protected activity.

The fact that Roland's "evaluations" did not address matters regulated by the FLSA is obvious given that she did not even conceive of the charge that Unity violated the FLSA until long after her employment at Unity ended and her age discrimination claim failed. (DPFOF, ¶¶ 169-177). Indeed, after Roland was discharged, she filed a "Labor Standards Complaint." The form asked whether Unity owed her "overtime," "minimum wage," "unpaid hours of work" and virtually all topics regulated by the FLSA. (DPFOF, ¶¶ 169, 170; Roland Depo., pp. 194: 19-24, 195: 1-23, Ex. 1008). Roland admits she did not allege any such wage law violation on such document. (Roland Depo., p. 199:3-10). If Roland did not believe Unity was in violation of

---

[8] Roland admits, however, that whenever she did the charting, she got paid at least her regular wage for the work. (Roland Depo., p. 146:18-25).

wage and hour laws in May 2007, it is hard to imagine that she intended her "complaints" about the call schedule to raise concerns about whether Unity was non-compliant with the FLSA.

Another element of a prima facie case which Roland failed to establish is the existence of similarly situated employees who did not complain and were not subject to adverse action. The undisputed facts are that Unity employees would, on occasion, complain about call. (DPFOF, ¶ 129). Roland, however, has failed to identify any similarly situated employee who was treated more favorably. Roland attempts to deal with this deficiency by asserting that no one else complained about call as much as Roland. As noted above, Roland's so-called "complaints" consisted of two ambiguous comments about poor schedules on an evaluation form Unity asked her to prepare. It is hard to comprehend how these so-called complaints were substantially different than the other complaints about call identified by Roland. The simple truth is that Roland has failed to establish that similarly situated employees, who did not complain, were treated more favorably than she was. Thus, she cannot establish a prima facie case.

Finally, Roland's retaliation claim must fail because she has not identified any disputed material fact which shows that Unity's stated reasons for discharging her were pretextual.

B. **Unity Terminated Roland for Failing to Make a Patient Visit on April 1, 2007 and Roland Has Failed to Show That Such Reason Was Pretextual**.

As noted in Unity's primary Brief and Proposed Findings of Fact, Roland had a number of performance problems in the months prior to her termination. (DPFOF, ¶¶ 136-142). Roland does not dispute these problems. (Plaintiffs' Response to Defendant's Proposed Findings of Fact ["PRDPFOF"], ¶¶ 136-142). However, the event triggering Unity's decision to terminate Roland was her failure to make a visit on the morning of April 1, 2007. (DPFOF, ¶ 143).

Significantly, Roland admits the essential facts of the incident: that she was contacted by the wife of a patient in the early morning hours and that the patient's wife reported that the

13
Case 1:07-cv-01103-WCG   Filed 10/30/09   Page 13 of 16   Document 73

patient was "very restless and having tremors." (PRDPFOF, ¶¶ 145-152). Roland admits that the wife was at her wit's end, yet Roland failed to make a visit. (PRDPFOF, ¶¶ 153-156, 174). Furthermore, Roland does not dispute that, after learning of the incident, Unity immediately investigated the matter, met and then made the decision to terminate her employment. (PRDPFOF, ¶¶ 159-167). Instead, Roland suggests that Unity has given inconsistent reasons for Roland's termination. However, Roland's argument is contradicted by the undisputed facts.

First, Unity has not given inconsistent reasons for Roland's discharge. When Unity responded to Roland's age discrimination complaint, its counsel described Roland's performance problems preceding the termination of her employment. (Declaration of Brown, Ex. H, p. 4). In addition, Unity's counsel wrote the following: "<u>Finally, when Unity received serious concerns from staff and patient (the second in four months) about Roland's failure to make a visit when clearly a visit was warranted, Unity decided to terminate Ms. Roland or offer her the option to resign</u>." (*Id.*) (Emphasis added). Such explanation is the same explanation given by Unity managers at their depositions in this proceeding. (DPFOF, ¶ 167).

Roland also argues that at the termination meeting, Unity told her that the reason for her discharge was that she was not meeting Unity's requirement of spending 40% of time with patients. Roland admits that she was not meeting this legitimate performance expectation. (PRDPFOF, ¶¶ 138-139). In addition, Braspennickx testified that she told Roland she was terminated because of a "patient care" issue, which is consistent with Unity's stated basis for terminating Roland. (Braspennickx Depo., pp. 130: 7-25, 131: 1-11). The fact that Roland and Braspennickx have a different recollection of what was said at the termination meeting, however, does not create a genuine issue of material fact. When Unity has been asked to explain the basis for the termination, it has consistently explained Roland's performance issues, but that the

14

triggering event leading to the discharge was Roland's failure to make a patient visit. (Braspennickx Depo., pp. 108: 24-25, 109: 1-25, 119: 6-21; DPFOF, ¶¶ 160-162).

In addition, Roland argues that the timing of her discharge was suspicious because she received a positive review in December 2006. There are numerous problems with Roland's argument. First, she ignores her admitted performance problems which followed her December 2006 evaluation, up to the time of her termination. In particular, Roland was failing to meet Unity's patient contact requirement (DPFOF, ¶¶ 137, 138), she failed to go to a patient assessment (DPFOF, ¶ 142) and she was not getting along with a co-worker (DPFOF, ¶ 141).

In addition, Roland ignores the intervening event (her failure to make a patient visit on April 1) as the triggering basis for Unity's decision. Unity has explained in detail the event at issue and the decision process that led to Roland's discharge. (See DPFOF, ¶¶143-168). Roland simply ignores this event in her argument as if it never occurred. Finally, there is no shred of evidence that Roland's complaint about the call schedule or Unity's conclusion that Roland was "negative" factored in its decision to terminate her employment. Indeed, it appears that Roland started complaining about the call schedule shortly after she began working at Unity (DPFOF, ¶120). Yet, it is undisputed that Unity took no action to terminate Roland's employment until a series of performance concerns in the spring of 2007 and right after she failed to visit a patient on April 1, 2007. Thus, the timing of Unity's decision is completely consistent with its stated basis for discharging Roland. The facts are simple undisputed: Unity determined that Roland's failure to make the patient visit was an offense that warranted Roland's termination. As a result, Unity's Motion for Summary Judgment dismissing Roland's retaliation claim must be granted.

## VI. CONCLUSION

As outlined above and in Unity's prior Brief, Plaintiffs have not established a basis to deny summary judgment. Accordingly, Unity's Motion for Summary Judgment must be granted.

15

Dated this 30th day of October, 2009.

                                        s/John A. Haase
                                        John A. Haase
                                        State Bar No. 1027536
                                        Annie L. Raupp
                                        State Bar No. 1070855
                                        GODFREY & KAHN, S.C.
                                        333 Main Street, Suite 600
                                        Post Office Box 13067
                                        Green Bay, WI  54307-3067
                                        Phone:   920-432-9300
                                        Fax:       920-436-7988
                                        Email:    jhaase@gklaw.com

                                        Attorneys for Defendant, Unity Limited
                                        Partnership

4312445_2