UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

PATRICIA ROLAND, et al.,

        Plaintiffs,

   v.                                                 Case No. 07-C-1103

UNITY LIMITED PARTNERSHIP,

        Defendant.

**DECISION AND ORDER**

       Plaintiffs in this Fair Labor Standards Act ("FLSA") case allege that they were not able to effectively use their on-call time for their own purposes, and thus their sub-minimum wage compensation violated the FLSA. They further assert that they are entitled to compensation for the two to three hours of unpaid "wait time" they experienced every week. Plaintiff Roland also alleges she was terminated in retaliation for filing a complaint under the FLSA. Defendant Unity Limited Partnership denies that its on-call policy violates the FLSA in any respect. Unity also denies that it retaliated against Roland by terminating her employment. The parties have filed cross-motions for summary judgment. For the reasons given herein, the Defendant's motion will be granted and the Plaintiffs' denied.

**I. Background**

       Unity Limited Partnership is a not-for-profit partnership among three Green Bay area hospitals that provides in-home palliative and hospice-style care to individuals in twelve

northeastern Wisconsin counties. Because that kind of care is often required at all hours of the day and night, Unity requires its nurses to work both regular and on-call shifts. Unity's on-call policy, as applicable to the facts of this case, called for a triage nurse to manage patient calls. When a patient, or family member called in, the triage nurse would gather basic information and then page the on-call nurse. While on call, nurses were subject to the following limitations: (1) carry a cell phone and pager; (2) remain within the nurse's service area (in this case, a radius of 30 or 35 miles from Marinette); (3) return a call or page from the triage nurse within 15 minutes; and (4) refrain from drinking alcohol. While on-call, Unity nurses received $2.00 per hour; in addition, they received overtime pay (time-and-a-half) during any periods they actually worked during their call shifts.

Plaintiffs Patricia Roland and David Breecher, both former Unity nurses, allege that these restrictions so limited their ability to engage in personal activities that they are entitled to be compensated at the minimum wage for all of their on-call time.[1] Roland generally worked between four and six call shifts per month, while Breecher worked eight or nine. Altogether, Roland worked 184 call shifts during the almost three years she worked for Unity, fifteen of which she volunteered to work. (Supp. Aff. of Jaclyn Berger, Ex. C.) Breecher worked a total of 192 call shifts during his tenure of slightly over two years, thirty-six of which he volunteered to work. (*Id.*, Ex D.) Both Plaintiffs also traded call shifts on occasion.

Roland alleges that Unity's on-call restrictions were too onerous because she was unable to do household chores like vacuuming, go to dinner with friends, drink alcohol or attend family events

---

[1]Plaintiffs state that Breecher was a "licensed nurse practitioner," but his hourly rate was significantly lower than Roland's rate as an RN. It is thus more likely that Breecher was a licensed practical nurse rather than a nurse practitioner.

2

out of town. As an example, Roland cites the 14-hour call shift beginning at 5:00 p.m. on December 23, 2005. During that period, she spent most of the first two hours charting[2] and listening to voice messages. Although Unity's on-call policy did not specifically require her to do this during her call shift, Unity's regulations required that charting be done within a certain period after a patient visit or treatment. This meant, according to the Plaintiffs, that as a practical matter a call shift was frequently the only time during which a nurse could complete her charting work. After charting on December 23, 2005, Roland visited a patient for more than an hour, and she performed an additional twenty minutes of charting before going to bed. She was awoken by a call at 4:45 a.m. and she visited a patient for more than two hours that morning. In total, she worked 6 hours during her 14-hour call shift (for which she was paid $43.88 per hour at time-and-a-half).

As Roland recognizes, however, the shift she cites as an example was not particularly representative of the norm. Overall, she averaged 21 on-call hours per week, and of those hours she spent an average of 4.75 hours doing her recognized duties. Thus, in an average 14-hour call shift she would work 3.2 hours, and of that amount only a portion was work arising from unexpected calls. Plaintiff Breecher worked an average of 3.3 hours during a typical 14-hour call shift. (Supp. Berger Aff., ¶ 24.)

Breecher and Roland also point to the fact that they performed work at least once during roughly 90% of their call shifts. In other words, it was the rare shift in which they did not do any work at all. Much of the work performed during call shifts was charting or other non-emergency work rather than work responsive to calls, however. The Defendants' records indicate that Roland

---

[2]Charting refers to entering data concerning the patient's treatment into a computer. (Pl.'s PFOF ¶ 89.)

3

received at least one call during 53% of her call shifts, while Breecher received at least one call during 62% of his shifts. Both Plaintiffs averaged just under one call per shift. (They received more than one call during some shifts and no calls on others, resulting in an average of about one per shift.) Moreover, many calls the Plaintiffs received did not require them to travel to make a patient visit. For example, out of the 184 call shifts Roland worked during her employment at Unity, she received calls requiring a patient visit 65 times or roughly 35%. (Def.'s PFOF ¶ 74.)

In addition to the restrictions of being on-call and the volume and frequency of work, Plaintiffs assert that they were prevented from engaging in meaningful personal activities due to the uncertainty and nature of the on-call work. On one day, for example, Roland unexpectedly had to travel twice to a distant location, requiring more than 200 miles of driving round-trip. The fact that significant work could unexpectedly arise caused Roland to "never start something that I couldn't walk away from." (PPFOF ¶ 143.) In her deposition she testified that she wouldn't go out for dinner with friends while on-call, nor would she even cook herself a meal apart from making a sandwich. (PPFOF ¶¶ 147-48.) She was awoken more than forty times during call shifts, and she missed several family events and other social functions. (PPFOF ¶ 151.)

Breecher experienced similar restrictions. He felt that he could not leave home while on-call due to the likelihood of being called. For example, during one of his first call shifts, he and his wife went shopping for paint, but he was called before they could finish shopping. On "two or three" other occasions, he went to a local bar near his home but was called away. These experiences caused him to stop engaging in social activities because he felt it was inevitable that they would be interrupted by work.

4

Case 1:07-cv-01103-WCG    Filed 03/29/10    Page 4 of 17    Document 76

**II. Analysis**

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On review of cross-motions for summary judgment, a court must view all facts and inferences in the light most favorable to the nonmoving party on each motion. *Wisconsin Alumni Research Foundation v. Xenon Pharmaceuticals, Inc.,* 591 F.3d 876, 882 (7th Cir. 2010).

**A. FLSA Claim for On-Call Shifts**

In applying the FLSA, courts and regulators have made a distinction between an employee who is "engaged to wait" and an employee who is "waiting to be engaged." An employee is engaged to wait when idle waiting is a part of the job he is asked to work. For example, a firefighter might spend 20 hours of a 24 hour shift doing nothing more than watching television, washing his car, eating and sleeping, but because he is "engaged to wait" his entire time is compensable. Waiting is part of the job. For employees asked to work call shifts, this concept is codified in 29 C.F.R. § 785.17, which provides:

> An employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while "on call". An employee who is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached is not working while on call.

In other words, if the on-call employee's activities are so restricted that he cannot use the time for his own purposes, he will be considered "engaged to wait" (like the firefighter) and must be paid accordingly. As the Seventh Circuit has noted, the analysis is highly fact-intensive: "[f]or most purposes it is best to ask what the employee can do during on-call periods. Can the time be

5

devoted to the ordinary activities of private life? If so, it is not 'work.'" *Dinges v. Sacred Heart St. Mary's Hospitals, Inc.,* 164 F.3d 1056, 1057 (7th Cir. 1999).

In *Jonites v. Exelon Corp.,* the Seventh Circuit addressed the on-call scheme operated by Commonwealth Edison. 522 F.3d 721, 723-24 (7th Cir. 2008). The company required employees to accept a certain minimum number of call-outs for emergency repairs. Rather than being "on call" for specific shifts, however, employees were expected generally to respond to at least 35 percent of the call-outs over the course of the year, and these calls could occur 24 hours a day. That is, the employees were not required to answer calls during specific periods, but employees had to answer a certain number of calls overall. The employees argued that "the frequent call outs disrupt their home life," *id.* at 722, but the Seventh Circuit gave the employees' argument short shrift. Citing 29 C.F.R. § 785.17, the Court noted that the "call-out procedure does not require that the worker stay at home or at any other designated location, but only that he be reachable by the company, and the regulation . . . goes on to provide that 'an employee who is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached is not working while on call.'" *Id.* at 723-24. The fact that employees must accept a certain number of call-outs at unpredictable hours was burdensome, no doubt, but the Court rejected the notion that it was so restrictive that employees should be fully compensated. "[T]hat does not mean that he must stay in the house all weekend. He just must stay within a two-hour radius of his normal duty station (for that is the time he is allowed for getting there if he accepts the call out). Is that such a hardship that it turns his waiting into working? We think not . . ." *Id.* at 724.

6

Similarly, in *Dinges v. Sacred Heart St. Mary's Hospitals, Inc.,* the Court reviewed a hospital's on-call policy that was applicable to its emergency medical technicians. 164 F.3d 1056 (7th Cir. 1999). While on-call, plaintiffs had to *appear* at the hospital within seven minutes (not just *answer* a call), and they were on-call during roughly half of their evenings. They could not drink alcohol, of course, and the short seven-minute window meant that they had to decline to attend any out-of-town family events, holidays, and other events that occurred during their call periods. One of the Plaintiffs was forced to maintain an "on call" babysitter to care for her children in the event she was called away. Although these restrictions were relatively severe, Plaintiffs in *Dinges* were called away during only about 50% of their call shifts. The Court concluded that the EMTs were not working during their call periods:

> The regulatory question is whether the employee can "use the time effectively for personal pursuits"-not for all personal pursuits, but for many. But then there is that weasel word "effectively." An employee who can remain at home while on call, but is called away every few hours, can't use the time "effectively" for sleeping, and probably not for many other activities. Plaintiffs, however, experience less than a 50% chance that there will be any call in a 14- to 16-hour period, so their time may be used effectively for sleeping, eating, and many other activities at home and around Tomahawk.

*Id.* at 1058.

I reach a similar conclusion here. The operative test asks whether the employee can use his time effectively for personal pursuits – many of them, not necessarily *all* of them. After all, the employee is being compensated for his time and should expect *some* level of inconvenience or interruption. Here, although there is no doubt that there were some meaningful restrictions on the Plaintiffs' ability to engage in their personal pursuits, many of the Plaintiffs' key complaints appear

7

to be the product of their own subjective reactions to the on-call regime rather than *requirements* of that regime.

For example, Unity's rules do not prevent Plaintiffs from engaging in social activities either explicitly or *de facto*. Although there is a chance that they will be called in while at dinner or shopping for paint, that is far from inevitable. No doubt they would not want to plan to attend an expensive non-refundable rock concert during a call shift, but Plaintiffs do not explain how a local shopping trip or a typical casual dinner out would be so impractical that they have given up on such things altogether. If one has to cut short a trip to the store every once in awhile, that is hardly a reason to forgo even *trying* to go shopping. Moreover, Plaintiffs were required only to call Unity back within fifteen minutes of a page – not to drop everything and race to the a patient's home. If Plaintiffs decided to go out for dinner during *every* call shift, no doubt there would be occasions when their phone rang just as their appetizer arrived. And of course they could not enjoy a beer with their fish fry (but they do not specifically complain about that restriction). Given relative infrequency of calls (less than 1 per 14-hour shift on average), however, and the fact that many calls did not require a patient visit, the chance of fitting in a dinner or children's soccer game was fairly good, and the fifteen-minute call-back window added an extra cushion.

The difference between the Plaintiffs in this case and those in *Dinges* is striking. Unlike Dinges, Roland and Breecher were not EMTs but nurses specializing in palliative care. Although they had to return calls within 15 minutes, they were not required to immediately leave whatever they were doing, race to the hospital within seven minutes and attend to a patient with the kind of urgency one might expect of EMTs. One Unity nurse testified that "there is no minimum time to make a patient visit if the need arises while I am on call. If a call requires a visit, I have time to stop

8

my personal activities and then travel to the site of the visit." (Patti Wagner Aff., ¶ 10.) One of Roland's own examples has her driving 50 miles to see a patient, and the rules require only that nurses be within thirty or thirty-five miles of Marinette. This geographical breadth and the time cushion allow nurses wide leeway and underscore the fact that the urgency is much less acute than in *Dinges*.

So far I have only addressed Unity's restrictions as they affect the Plaintiffs' social activities, such as attending parties, events and going out to eat. Naturally, because social activities involve making plans with other people and require some investment of time (and sometimes involve drinking), any set of on-call restrictions will have its greatest impact on those types of endeavors. But of course the operative analysis asks how the restrictions affect *all* of the employee's activities – not just the ones most impacted by the on-call rules. Given the infrequency of calls, a nurse is far more likely to receive a call while sitting on the couch or at the kitchen table. When one considers all of an individual's potential personal activities – things like eating, sleeping, doing housework, reading, watching television, exercising, shopping – it is clear that the on-call rules are not particularly restrictive at all.

This is borne out in the actual experience the Plaintiffs have cited. For example, even in Roland's own example (presumably picked to demonstrate how burdensome the restrictions were) she was able to get almost a full night's sleep during her call shift.[3] The displeasure of being woken up at 4:45 in the morning is not to be minimized, but then again the idea of being paid to sleep is just as difficult to overlook. *Dinges,* 164 F.3d at 1059 (noting the "attractive" prospect of being

---

[3]The cited example does not appear typical. According to her time sheets, it appears that on 96% of her call shifts, Roland recorded no work between 10:00 p.m. and the end of her shift. (Supp. Aff. of Jacalyn Berger, Ex. C.)

9

paid to sleep.) Apart from that, however, it is unclear how the occasional call and the need to leave for roughly two hours in a 14-hour shift would preclude anyone from doing almost anything. As noted above, nurses are not required to drop everything immediately when the phone rings – there is a fifteen-minute window that would allow them to finish a chapter in a book, change the laundry, finish a meal, click "send" on their email, etc., and DVRs and VCRs have enabled people to watch television shows whenever they want. In short, among the wide variety of personal activities individuals engage in, there are relatively few that would be ruined or significantly disrupted by Unity's requirements.

Plaintiffs rely most heavily on the fact that they actually did some modicum of work during most (90%) of their call shifts. But because Plaintiffs fail to differentiate between work that arises suddenly and unexpectedly as a result of a call from the triage nurse, and scheduled or unscheduled regular work, this statistic is highly misleading. It is the possibility that a nurse can be called on suddenly and unexpectedly during a call shift to visit a patient that makes that time less valuable to the employee. The risk of receiving a call at any time can affect the employee's choice of what personal activities to undertake. Previously scheduled work and charting, on the other hand, does not have the same disruptive effect. The employee knows of the previously scheduled work ahead of time and can arrange his or her schedule around it. And assuming charting must be done at all during a call shift, it can generally be performed when it is convenient.[4] In effect, having prescheduled regular work assigned during a call shift shortens the call shift by converting that

---

[4] Nurses generally have 72 hours from a patient visit within which to complete most of their charting duties. Assessments and medication changes must be charted within 24 hours of a patient visit. Thus, only a small percentage of charting had to be done on call shifts. (Suppl. Berger Aff., ¶ 19.) Doing it while on call, however, assured the nurse that he or she would be paid for it at the overtime rate.

10

portion of the call shift into overtime work. And having charting work available to do during a call shift similarly allows the employee to convert a portion of his or her call shift to overtime work. Nothing in the FLSA prevents an employer from requiring employees to perform overtime work, whether they are on call or not, as long as they are paid one-and-a-half times their regular hourly rate. 29 U.S.C. § 207(1). Here, there is no dispute that Plaintiffs were paid at overtime rates for all work they performed while on call.

For these reasons, the charting and prescheduled work nurses performed during their call shift is largely irrelevant to the question of whether they are entitled to compensation for on-call time in general. Suppose, for example, that Unity had no on-call policy whatsoever, and nurses worked regular shifts and nothing more. In that event, Unity's practice of scheduling work outside a nurse's normal shift and its 72-hour (or 24-hour) charting requirement would still require nurses to perform the work or complete charting on weekends or other off days. Because these additional work requirements would impose the same restrictions on nurses *regardless* of whether they were on-call, it is clear that these practices operate independently from its on-call policy. As such, there is no reason to view previously scheduled work or charting requirements as being restrictions placed on employees while they are on-call.

A less misleading measure of the extent to which Plaintiffs' on-call duties restricted their personal activities, then, is the frequency and number of calls they received during their shift, the response the calls required, and the restrictions to which they were subject. To repeat, Roland and Breecher received calls on only 53% and 62% of their shifts, respectively. They each averaged less than one call per 14-hour shift overall, and many calls did not require that they respond in person. They were able to move about in a very large radius, and they had 15 minutes to return a call and

11

a reasonable amount of time to appear at the patient's home or hospice. The impact of these restrictions meant that reasonable employees would not be so restricted in their ability to engage in personal activities that the FLSA requires compensation. The requirements in *Dinges* were far more intrusive, and even there the Seventh Circuit found no FLSA violation. The regulation, too, suggests that something far more restrictive is required before full compensation is owed: "[a]n employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while 'on call.'" 29 C.F.R. § 785.17. Unity's on-call policy does not even approach that level of restrictiveness.

Ultimately, I conclude that Plaintiffs' complaints about Unity's call policy are based largely on their own, somewhat idiosyncratic, reactions to the policy rather than any requirements the policy would impose on a typical person. Plaintiff Roland's statement that she could not even cook a meal is emblematic. Recall that she had only slightly better than a fifty-fifty chance of being called over the course of an entire fourteen-hour span (even less that she would be required to leave her home), and thus her opinion that she could not even cook seems patently unreasonable, especially in comparison to the statements of several other nurses who apparently have no trouble engaging in a wide variety of personal activities. In addition, Plaintiffs' efforts to portray the Unity policy in a draconian light fail to account for the means nurses have to ameliorate the impact of the policy. For example, the call schedule is published several months in advance, and nurses can swap shifts with other employees. (Mertz Aff., ¶ 6; Pichette Aff., ¶ 7.) Thus, if Plaintiffs are unable to attend an important out-of-town event, their inability to do so is at least possibly the result of a failure to plan and take advantage of the system rather than a burden mandated by the employer.

12

Finally, as the Seventh Circuit has noted, it is usually best to let private agreements lie unless the FLSA violation is clear-cut:

> To the extent there is uncertainty-and the open-ended regulatory standard, combined with the Supreme Court's oracular "test," ensures uncertainty-we must take account of the arrangement plaintiffs themselves chose. They sought first-out status because it created the best earnings opportunity, and they agreed to a combination of hourly pay for on-call hours plus time-and-a-half for actual emergency calls. The prospect of being paid for spending time at home (even time asleep) must have been attractive. Although the FLSA overrides contracts, in close cases it makes sense to let private arrangements endure-for the less flexible statutory approach has the potential to make everyone worse off. Suppose we were to hold that time the EMTs spend on call counts as "work." That would produce a windfall for Dinges and Foster today, but it would lead the Hospital to modify its practices tomorrow. If the EMTs are "working" 24 hours a day, then the Hospital will abolish the on-call system and have EMTs on its premises 24 hours a day, likely hiring additional EMTs so that it can limit the premium pay for overtime.

*Dinges,* 164 F.3d at 1059.

Here, Plaintiffs signed up for jobs with written on-call policies. They volunteered for *additional* on-call shifts, despite their present claims that their employer's policy was too onerous. Accepting Plaintiffs' arguments would result in worse conditions for employees, additional burdens to the employer, higher health care costs, and tremendous waste. *Id*. For the reasons given above, I conclude that the Defendant is entitled to summary judgment on the on-call FLSA claim.

**B. FLSA Claim for "Wait Time"**

Plaintiffs also claim they are entitled to the minimum wage for "wait time" they worked during their regular shifts. Whereas they received $2.00 per hour while on-call, they received no compensation for this wait time. For example, on June 9, 2006, Nurse Roland arrived at the office at 8:40 a.m. Earlier that morning, however, she had done intermittent work including travel,

13

listening to voice mail and conversing with a patient's caregiver. Although she was paid at her regular rate (or overtime) for that work, she was not paid during the one-hour gap between 6:40 a.m. and 7:40 a.m. Plaintiffs assert that these gaps – "wait time" – essentially belonged to the employer because the employees could not use the time for their personal endeavors.

Unity first asserts that this claim was not pled in the complaint and is now only raised via Plaintiffs' motion for summary judgment. As such, it reflects an improper effort to amend the pleadings, and Unity was unable to engage in meaningful discovery on the claim. Unity also objects that Plaintiffs' "evidence" is based on a single anecdotal example given by Roland.

Although these procedural objections are not without merit, it is clear that Plaintiffs' "wait time" claim fails on the merits. Unity has explained that a standard work shift lasts from 7:00 a.m. to 5:00 p.m. Even so, nurses are not required to work that ten-hour span in the way most typical employees in other offices are. For example, although some nurses work 7:00-5:00, others take uncompensated time off during their shifts. Still others begin their shifts early. A nurse has a fixed amount of work to get done during a shift, and sometimes it can be done in less time. In Roland's example, she began working her shift at 6:15 (instead of 7:00) and then decided on her own to take an hour off beginning at 6:40. That is perfectly acceptable under Unity's policy, but importantly the hour off was a wholly volitional act of Roland. It was not "wait time" demanded by the employer but simply Roland's decision to not work for that hour. Had she wanted to receive compensation for that hour, she could have worked during that hour. Alternatively, she could have delayed starting her shift until 7:00, in which case she would not have had any "gap" at all. The fact that she voluntarily began work earlier than was required and then created an hour-long gap in her schedule does not entitle her to compensation for that gap. As Unity notes, it would not make sense

14

to allow an employee to take advantage of a flexible schedule and then engineer her employer's FLSA violation by creating a gap of "wait time" in his own schedule.

**C. Retaliation**

Finally, Plaintiff Roland alleges that she was terminated in retaliation for making a complaint under the FLSA. (Unity states that it terminated her for failing to make a personal visit to a dying patient.) Under the FLSA's anti-retaliation provision, an employer may not discharge an employee because "such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3). The Seventh Circuit has recently clarified that "internal, intracompany complaints are protected" – not just formal complaints filed with agencies. *Kasten v. Saint-Gobain Performance Plastics Corp.,* 570 F.3d 834, 838 (7th Cir. 2009).

Roland alleges that roughly four months prior to being terminated she made a written complaint to her supervisor, and the gist of her complaint had to do with a new company policy reducing time-and-a-half hours for charting and other work. She asserts that this was a complaint about "call and wage issues" and, as such, it was a complaint "related to" the FLSA, 29 U.S.C. § 215(a)(3). (Dkt. 67 at 67.)

The actual form Roland cites was not a specific complaint form, however, but simply a periodical evaluation form. The company was soliciting information from its employees such as what they enjoyed about the job and what they disliked. In response to the question, "What would cause you to leave [Unity]?" Roland wrote that "I'm a person not a number in the computer (3 out of 4 weekends in Jan. working!)" (Dkt. # 30, Ex. 9.) She further cited Unity's expectation that

15

charting be done on days off and suggested that with respect to new pay rules for charting – "time frames [are] terrible and for Unity's benefit, not the employee or 50/50." (*Id.*)

In substance, Roland's complaint is indeed about wage issues, and at least tangentially about call issues. But in essence she was complaining that she worked too many weekends for her taste and that new rules meant she would not receive only standard pay rather than overtime pay for her work charting. These are not FLSA complaints. Having to work weekends is not a violation of the FLSA, and neither is a company's policy governing charting work. There is no allegation that any law was broken or that Plaintiff's wages or hours worked were illegal. Instead, the complaint is that Unity was being greedy by changing its policy for its own benefit. If every employee complaint about its employer's policies could be interpreted as a complaint relating to the FLSA, then employees could state a *prima facie* case of retaliation any time they were fired after mouthing off at work. If asked by their employer (as Roland was), presumably millions of employees would state that they believed they were underpaid or overworked, but that is a far cry from alleging that their employer is violating the labor laws. Generalized complaints about work conditions or pay are not the sorts of whistleblowing the FLSA was meant to protect, especially when such complaints were made at the company's own invitation. No one reading Roland's evaluation form would reasonably conclude that she was alleging any violation of, or anything "related to," the FLSA.

Roland responds by noting that even if the complainant is *wrong* in the merits of her complaint, she is still entitled to anti-retaliation protection because that protection expands to protect a complainant's good faith beliefs. That is true. Anti-retaliation provisions are intended to protect whistleblowers, and the whistleblower need not have the law perfectly right in order to receive such protection so long as he is acting in good faith. But the good faith protection does not

16

apply to everything an employee ever says about his employer – instead, it applies only if the complainant is lodging a complaint about *violations* of the labor laws. "Congress . . . wanted to encourage *reporting of suspected violations* by extending protection to employees who filed complaints, instituted proceedings, or indeed, testified in such proceedings, as long as these concerned the minimum wage or maximum hour laws." *Sapperstein v. Hager,* 188 F.3d 852, 857 (7th Cir. 1999) (italics added). As that court noted, "there is no requirement that those laws must actually be violated. It is sufficient that the plaintiff had a good-faith belief that they might be violated." *Id.* Here, there is not even an allegation that Roland ever claimed Unity violated any labor laws. Her only complaint was that her pay was being reduced and she worked too many weekends. As such, there is no evidence that Roland ever believed (even wrongly) that the labor laws were being violated. Accordingly, she has failed to establish any basis for her retaliation claim.

### III. Conclusion

For the reasons stated herein, the Defendant's motion for summary judgment is **GRANTED** and the Plaintiffs' is **DENIED**. The case is **DISMISSED**. The Clerk is directed to enter judgment forthwith.

**SO ORDERED** this 29th day of March, 2010.

                                                /s William C. Griesbach
                                                William C. Griesbach
                                                United States District Judge